JEFF WITHROW and
KEVIN NESTOR,

       Plaintiffs,

v.

FCA US LLC,

       Defendant.

Case No. 19-13214
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS [29]

---

This case involves an allegedly defective vehicle part. A Bosch CP4 fuel-injection pump. Jeff Withrow owns a diesel-powered Dodge Ram 1500. Kevin Nestor owns a diesel-powered Jeep Grand Cherokee. Both vehicles are made by FCA US LLC and both CP4 pumps failed. Nestor and Withrow believe that their pumps failed due to the CP4's fragile design and incompatibility with U.S. diesel fuel. In other words, they believe the CP4 pump is defective. Nestor and Withrow further believe that FCA was aware of this defect when it sold their vehicles yet never disclosed the defect to them.

So Nestor and Withrow sued FCA, alleging fraud, breach of the implied warranty of merchantability, and violation of state consumer protection acts (among other claims). Nestor and Withrow also seek to represent owners and

lessees of Rams and Jeeps in the District of Columbia and 49 states. So their complaint is hundreds of pages long and contains over 110 counts.

FCA has moved to dismiss them all. The auto manufacturer seeks dismissal under Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs lack Article III standing to pursue many of the claims they have filed. On this point, the Court agrees. FCA also seeks dismissal under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs have not stated a claim upon which relief may be granted. On this point, the Court only partly agrees. So FCA's motion will be granted in part and denied in part as detailed at length below. A table at the end of this opinion summarizes this Court's determinations.

## I. Facts

### A. The CP4 Pump

To understand the parties' dispute, it helps to know a bit about fuel-injection pumps and, in particular, the Bosch CP4 fuel-injection pump.

In a diesel engine, a fuel-injection pump places fuel under high pressure and forces it through a fuel injector. (PageID.808.)[1] The injector is connected to the cylinder chamber, and the process of forcing fuel through the injector at high pressure causes the fuel to become mist-like when it enters the cylinder chamber. (*See* PageID.808.) This fuel mist is then combusted inside the cylinder chamber,

---

[1] Unless otherwise indicated, all record citations are to ECF No. 26, the amended complaint.

which drives one of the engine's pistons. The pistons rotate the crankshaft, and the crankshaft (through a series of connections) turns the vehicle's wheels.

Center stage in this case is a particular fuel-injection pump, Bosch's CP4 pump. Although the CP4 pump has quite a few subparts, three are key here: a cam (shaped like an oval donut), a roller (similar in size and shape to a AAA battery), and a tappet (a larger cylinder that holds the roller). (PageID.812–813.) Below is a picture of the cam (on a cam shaft), the roller, and the tappet (holding the roller).



*Cam-Shafts & Rollers of CP4 Pump*, Sirini, https://perma.cc/63K9-PECZ. The CP4 pump has a pair of roller-tappet systems that operate identically. (*See* PageID.814.) In operation, the oval-shaped cam spins, and the battery-shaped roller rolls along the cam. (*See* PageID.814.) The picture below shows how the cam's rotation moves the tappet up and down and thus pumps fuel (on the left, the cam has pushed the tappet to the high position, while the tappet on the right is in the low position).



(PageID.814.)

According to the complaint, the CP4 has a "fragile" design. Unlike its predecessor, the CP3, the portion of the cam's surface that is in contact with the roller is very limited and that limited contact area is under very high force. (PageID.815.) Further, the lubrication at this contact area is very, very thin, meaning that contamination of the lubrication or a small change in lubricity can result in the roller sliding on the cam rather than (as designed) rolling on it. (PageID.814.) The tappet also contributes to the CP4's allegedly fragile design. The tappet can rotate out of position causing the roller to slide across the middle of the cam and damage the cam. (PageID.816.) An out-of-position tappet, roller, and damaged cam are shown below:



(PageID.821.) The limited contact area between the cam and roller, the high force at the contact area, the roller and cam's lubrication sensitivity, and the possibility of the tappet rotating out of position together contribute to an allegedly "fragile" design.

In addition to this allegedly fragile design, the CP4 pump is allegedly not compatible with U.S. diesel fuel. As noted, lubrication between the roller and cam ensures that the roller rolls along the cam's surface. By design, the vehicle's fuel—diesel—serves as the lubrication. (PageID.822.) In Europe (where the CP4 pump is also used in vehicles), diesel has enough lubricity to allow the roller to roll on the cam smoothly. (*See* PageID.832–833.) But diesel fuel in the United States is lower in sulfur and thus, has lower lubricity. (PageID.822–823.) And aside from low sulfur levels, during the manufacturing or shipping process, diesel can be contaminated with water or gasoline, both of which reduce the diesel's lubricity. (PageID.829–830.) While some gas stations in the United States provide diesel fuel that has sufficient lubricity for the CP4 pump, many—perhaps three in ten— do not. (PageID.828.) And given how fuel is supplied in the United States, a

"consumer has no way of knowing the lubricity of the fuel at a standard retail refilling station." (PageID.829.) The result of all of this is that for many people who own vehicles with a CP4 pump, their pump may be operating without the required lubrication. This results in friction and wear between the roller and cam.

Whether due to the high force between the roller and cam, a tappet that has rotated out of position, inadequate lubricity between the roller and cam, or some combination of all three, the result is undesired rubbing of the roller and cam. One byproduct of the undesired rubbing is metal particles. These metal particles can spread throughout the fuel system. (PageID.819, 849–850.) One place the particles can end up is in the fuel injectors. (PageID.849–850.) If the particles prevent the injectors from closing, much more fuel than necessary will be dispersed into the cylinder chamber. (PageID.850.) This reduces fuel economy. (PageID.850.)

If the CP4's roller rubs on the cam rather than rotating around it, more serious problems can occur too. For one, the metal particles "can cause progressive or sudden damage to the pump, injectors, engine, turbocharger, and aftertreatment systems." (PageID.819.) And if the roller and cam become damaged from rubbing, the fuel pump will not create the necessary pressure and the engine will not start or, if it is running, will stop. (PageID.819.) In other words, the pump's failure can cause "catastrophic" engine failure, including while the vehicle is in operation. (PageID.819.) (As if to leave no doubt on this point, the complaint uses the word "catastrophic" or "catastrophically" 254 times.)

To summarize, the complaint asserts that the "CP4 pump's fragile design is not built to withstand U.S. diesel fuel specifications in terms of lubrication or water content." (PageID.795.) The pump "requires a cam and . . . rollers designed to seamlessly roll together without skipping, sliding, sticking, or wearing in order to operate effectively." (PageID.795.) "If the fuel used with the CP4 pump is not sufficiently lubricious—which most U.S. diesel is not—the cam and rollers wear against each other and generate tiny metal shavings that disperse throughout the high-pressure fuel injection system." (PageID.796.) Additionally, wear on the cam or roller can result in "complete roller and tappet breakdown." (PageID.818.)

Several car manufacturers, including Volkswagen and Audi, have used the Bosch CP4 pump in their vehicles. In February 2011, the National Highway Traffic Safety Administration opened a safety investigation based on 160 complaints about CP4 pumps failing in Volkswagen and Audi vehicles. (PageID.830.) During the investigation, Volkswagen and Audi exchanged emails with Bosch. For instance, after Audi sent Bosch a failed CP4 pump for analysis in August 2009, Bosch responded to Audi, "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. Defect caused by customer." (PageID.832.) As another example, in June 2011, a Volkswagen representative told Bosch, "I have here a pump from a [Volkswagen car]. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them." (PageID.833–834.) As part of

NHTSA's investigation, these emails and other documents were published on NHTSA's website. (PageID.831.)

General Motors also used the CP4 pump in its vehicles, and there have been at least four lawsuits asserting that GM sold vehicles knowing that they had defective CP4 pumps. *Chapman v. Gen. Motors LLC*, No. 19-12333, 2021 WL 1286612 (E.D. Mich. Mar. 31, 2021); *Click v. Gen. Motors LLC*, No. 18-455, 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020); *Dawson v. Gen. Motors LLC*, No. 19-8680, 2019 WL 3283046 (D.N.J. July 22, 2019); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871 (N.D. Cal. 2019).

## B.    The Parties

The defendant in this case is not Volkswagen or General Motors, but FCA US, LLC, the North American arm of what was formerly Fiat Chrysler Automobiles. (Fiat Chrysler Automobiles recently merged with PSA Group to form Stellantis, but the events giving rise to this suit mostly occurred before that merger.) FCA US, which the Court will refer to as "Fiat-Chrysler," began using the CP4 pump in its vehicles with 3.0L EcoDiesel engines in 2013, i.e., in 2014 model-year vehicles. (PageID.795, 851, 877.) Among these EcoDiesel vehicles are Jeep Grand Cherokees and Dodge Ram 1500s. (PageID.795.)

One of the two plaintiffs in this case is Kevin Nestor, a California resident. (PageID.801.) In 2014, Nestor bought a Jeep Grand Cherokee from a Fiat-Chrysler dealer in California. (PageID.801.) In April 2019, after driving the vehicle for five years and 68,000 miles, his Jeep "experienced a catastrophic

failure of its CP4 fuel pump." (PageID.801–802.) Nestor brought his Jeep to a Fiat-Chrysler dealership, and the service center told him that metal shavings from the fuel pump had spread throughout the fuel system. (PageID.801.) The estimated repair cost was $7,600. (PageID.801.) Although Nestor's Jeep was still within the five-year, 100,000-mile warranty limits, Fiat-Chrysler refused to repair the vehicle. (PageID.801–802.) Nestor implies that Fiat-Chrysler refused warranty coverage because the company believed he had put contaminated fuel in the Jeep. (PageID.802.)

Jeff Withrow, a Connecticut resident (PageID.799), is the other plaintiff in this case. In 2017, Withrow bought a used Dodge Ram 1500 from a dealer in New Jersey. (PageID.799.) At the time of Withrow's purchase, the Ram was only a year or two old and had only 19,000 miles on the odometer. (PageID.799.) After driving the truck for about a year, the Ram "quit" when Withrow was driving on the highway. (PageID.799.) The truck had 31,500 miles on it at the time. (PageID.799.) Withrow brought his Ram to a Fiat-Chrysler dealer in Connecticut, and the dealer told him that there was metal debris in the fuel pump. (PageID.799.) Although Withrow does not say why Fiat-Chrysler would not repair his truck under the truck's warranty, he does say that he ended up paying $12,000 out of his own pocket to fix his Ram. (PageID.800.)

## C. Procedural History

In October 2019, Nestor and Withrow filed this lawsuit, and in March 2020 they filed an amended complaint. They allege that the CP4 fuel-injection pump is

defective. And they assert that Fiat-Chrysler knew the pump was defective before they bought their vehicles. Plaintiffs say that despite that knowledge, Fiat-Chrysler either actively concealed the defect from them or, at minimum, did not fulfill its duty to disclose the defect to them. Based on these allegations, Plaintiffs assert that Fiat-Chrysler is liable for (1) common-law fraud, (2) common-law breach of contract, (3) breaching the implied warranty of merchantability, (4) violating the Magnuson-Moss Warranty Act, and (5) violating the consumer-protection acts of California, Connecticut, and New Jersey.

And Nestor and Withrow say they are not the only ones harmed by Fiat-Chrysler's failure to disclose the problems with the CP4 pump. They seek to represent a nationwide class of hundreds of thousands who purchased or leased a Jeep Grand Cherokee with a 3.0L EcoDiesel engine or a Dodge Ram 1500 with a 3.0L EcoDiesel engine. (PageID.795.) In addition to the nationwide class, Nestor and Withrow want this Court to certify 50 subclasses, one for the District of Columbia and one for each of 49 states. (There is already a separate lawsuit against Fiat-Chrysler over the CP4 pump for Texas consumers. *See Berry v. FCA US, LLC*, No. 2:19-cv-00023 (S.D. Tex. filed Jan. 18, 2019).) Nestor and Withrow's complaint thus includes one to three claims under the law of 50 different jurisdictions. In all, their complaint is comprised of over 1,600 paragraphs and over 110 counts. (*See* ECF No. 26.)

In May 2020, Fiat-Chrysler moved to dismiss the entire complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 29.) Their motion raises nearly 20 grounds for dismissal.

## II.    Rule 12(b)(1)

First things first; jurisdiction before merits. Under Article III of the U.S. Constitution, federal courts are limited to deciding "Cases" and "Controversies." And for there to be a case or controversy, the plaintiff must have standing to pursue the legal claims he raises. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In turn, the "irreducible constitutional minimum of standing consists of three elements": "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

In Fiat-Chrysler's view, Nestor and Withrow lack Article III standing. Fiat-Chrysler argues that Plaintiffs have not pled facts showing that it was the cause of their injuries, and thus they have not satisfied the "traceability" requirement of Article III standing. Fiat-Chrysler also argues that Nestor and Withrow lack Article III standing to bring claims under the laws of any state other than California (Nestor's residence and where he bought his Jeep), Connecticut (Withrow's residence), and New Jersey (where Withrow bought his Ram).

### A.    Traceability

Fiat-Chrysler points out that in their complaint, Nestor and Withrow acknowledge that events outside of Fiat-Chrysler's control may contribute to the

CP4 pump's failure. (ECF No. 29, PageID.1550, 1556.) For instance, Plaintiffs suggest that inadvertent misfuelling (gasoline instead of diesel), running out of fuel, or a late fuel-filter change might result in inadequate lubrication between the CP4 pump's cam and roller, thus contributing to the pump's failure. (PageID.811.) But, Fiat-Chrysler argues, none of those actions are attributable to it—those are consumer actions. (*See* ECF No. 29, PageID.1556–1557.) The complaint also alleges that water or gasoline might contaminate diesel fuel before it reaches the gas station. (PageID.830.) Also not Fiat-Chrysler's fault. Fiat-Chrysler stresses that both Nestor and Withrow put many thousands of miles on their vehicles before their pump broke (ECF No. 29, PageID.1556), apparently implying that any number of post-manufacturing events could have caused the CP4 pumps in their vehicles to fail. In fact, says Fiat-Chrysler, Nestor pleads that he was denied warranty coverage "based on alleged fuel contamination." (ECF No. 26, PageID.802; ECF No. 29, PageID.1556.) In Fiat-Chrysler's view, all of this shows that Nestor's and Withrow's injuries are not traceable to its conduct.

Fiat-Chrysler is correct that as part of their burden to establish subject-matter jurisdiction, Nestor and Withrow must show that their injuries are "fairly traceable" to its conduct. *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019); *see also Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) (finding no Article III standing where injury was the result of a third-party's actions, not the defendant's). And Fiat-Chrysler is correct that if Nestor or Withrow put gasoline

in their vehicles or fueled up at a station selling contaminated diesel, those actions would not be traceable to Fiat-Chrysler.

Those points having been given their due, it remains that Nestor and Withrow have adequately alleged traceability.

To start, the law helps their cause. Article III's traceability requirement is not overly demanding. *See Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 713 (6th Cir. 2015) ("[T]he causation need not be proximate."). And when, as here, the defendant asserts that the allegations of the complaint do not establish standing, this Court must construe the factual allegations in the light most favorable to the plaintiffs and draw reasonable inferences from those allegations in their favor. *See Mosley v. Kohl's Dep't Stores*, Inc., 942 F.3d 752, 756 (6th Cir. 2019).

Heeding this law and taking the allegations in the light most favorable to Plaintiffs, Nestor and Withrow's point is that a reasonably prudent consumer will occasionally misfuel or tardily change their fuel-filter. (PageID.811; *see also* ECF No. 32, PageID.1677.) And because diesel in the United States is often contaminated with gasoline or water, they say it is inevitable that consumers will sometimes put less than pure diesel in their vehicles. (PageID.829.) In Plaintiffs' view, an occasional misfuelling, late filter change, or fueling at a station with contaminated diesel are all part of the normal, expected use of their vehicles. (*See* PageID.811; ECF No. 32, PageID.1677.) Thus, any decent fuel pump, they say, should be able to tolerate these sure-to-arise situations. (*See id.*) Indeed, Nestor and Withrow imply that the CP4 pump's predecessor, the CP3, was designed more

robustly and had no issues with U.S. diesel. (PageID.811 ("The reliability of the CP3 became key to the 'million-mile' performance reputation of diesel truck engines in the United States.").) So even if actions not attributable to Fiat-Chrysler contributed to Nestor's or Withrow's CP4 pump failing, to the extent that those actions are part of normal vehicle use, Plaintiffs have adequately pled that their injuries stem from the CP4. And if their injuries stem from the CP4, they are fairly traceable to Fiat-Chrysler, the company that chose to use the CP4 in its vehicles.

In short, the complaint will not be dismissed on the grounds that Nestor's and Withrow's injuries are not fairly traceable to Fiat-Chrysler's use of the CP4 pump.

### B.     Standing to Pursue Violations of 50 Jurisdictions' Laws

Fiat-Chrysler makes a second Article III argument: that Nestor and Withrow—currently the only plaintiffs to this suit—have no standing to bring claims under the laws of any state other than the three where they reside or bought their vehicles (California, Connecticut, and New Jersey).

A review of the case law reveals that this issue often arises in cases where a handful of named plaintiffs bring claims under dozens of states' laws. In fact, Nestor and Withrow cite many cases where courts deferred this standing question—whether named plaintiffs can pursue claims under the laws of states not their own—to the class-certification stage. *See Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 884 (E.D. Mich. 2019); *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d

626, 641 (E.D. Mich. 2019); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1089 (E.D. Mich. 2018); *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 587–88 (E.D. Mich. 2017); *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612, at *11 (E.D. Mich. June 6, 2013); *Hoving v. Transnation Title Ins. Co.*, 545 F. Supp. 2d 662, 667 (E.D. Mich. 2008). Nestor and Withrow ask this Court to follow these cases and defer the standing question to the class-certification stage of the case.

For three reasons, the Court does not find the decisions Nestor and Withrow cite persuasive.

*One*. All of Nestor and Withrow's cases directly or indirectly rely on some combination of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998). This is understandable. In each of *Amchem*, *Ortiz*, and *Fallick*, the court either found that the class-certification question should be answered before the standing question or otherwise found that the parties' dispute was a Rule 23 dispute rather than an Article III dispute. But on the facts of this case, the Court does not believe *Amchem*, *Ortiz*, and *Fallick* are instructive.

Consider *Amchem* first. There, a settlement for asbestos exposure was reached before the case was even filed, and a motion to certify a settlement class was docketed with the complaint. "The class action thus initiated was not intended to be litigated." 521 U.S. at 601. That's not true here. And in *Amchem*, the objectors to class certification argued (among other things) that the "exposure

15

only" class members lacked standing because they had not yet suffered injuries or, at least, redressable injuries. *Id.* at 612. The Third Circuit declined to resolve this standing issue, reasoning that "the jurisdictional issues in this case would not exist but for the [class-action] certification"; on this point, the Supreme Court agreed. *Id.* at 612–13. But here, the standing issue is not whether class members have injuries or redressable injuries; the issue is whether Nestor and Withrow may raise claims under the laws of states not their own. So *Amchem* is simply not instructive on the facts of this case.

In *Ortiz*, the Supreme Court found that "the class certification issues are, as they were in *Amchem*, 'logically antecedent' to Article III concerns." 527 U.S. at 831. But, like *Amchem*, *Ortiz* was "a class action prompted by the elephantine mass of asbestos cases," *id.* at 821, the parties settled first then filed a settlement class action later, *id.* at 824–25, and objectors claimed that the legal claims were contrived for settlement (and thus not justiciable) and that the "exposure only" class members did not have redressable injuries, *id.* at 831. So as far as Article III standing, *Ortiz* is just like *Amchem*. Thus, for all the reasons *Amchem* is materially different than this case, so too is *Ortiz*.

That leaves *Fallick*. There, the plaintiff was a member of an employee healthcare plan and challenged how the plan administrator, Nationwide, calculated coverage for medical expenses. 162 F.3d at 412. The plaintiff also sought to represent people who were members of other healthcare plans "administered or promulgated by" Nationwide. *Id.* The district court found that

the plaintiff lacked standing to represent people who were not members of his healthcare plan. *Id.* at 421–22. The Sixth Circuit reversed. Because the plaintiff was challenging Nationwide's methodology for calculating coverage—the same methodology that Nationwide used for every one of the plans it administered—the plaintiff had standing to bring claims on behalf of those who were members of plans other than his. *Id.* at 423. Unlike in *Fallick*, where the legal claims were identical for members of the plaintiff's plan and for members of other plans, *id.* at 423, Nestor's claim under the California Unfair Competition Law is not likely to be identical to a claim under say, the Montana Unfair Trade Practices Act. And even if those two legal claims happen to be identical, the same cannot be said of the laws of all 50 jurisdictions that Plaintiffs seek to represent. So *Fallick* is not on point, either.

*Two.* Apart from the fact that the courts in Nestor and Withrow's cases relied on *Amchem*, *Ortiz*, and *Fallick*, those courts deferred the standing question to the class-certification stage without acknowledging that standing must be determined on a claim-by-claim, relief-by-relief basis. In the words of the Supreme Court: "[O]ur standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press. . . . We have insisted . . . that a plaintiff must demonstrate standing separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal quotation marks omitted). And in the words of the Sixth Circuit: "It is black-letter law that standing is a claim-by-claim issue." *Rosen v. Tennessee Com'r of Fin. & Admin.*, 288 F.3d 918, 928

(6th Cir. 2002); *see also Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019). In the cases cited by Nestor and Withrow, the courts did not expressly address this black-letter law. Instead, most say something like the following: "[a]ll of the named Plaintiffs in our case have Article III standing. If the class is certified, those Plaintiffs will be able to advance state law claims on behalf of unnamed Plaintiffs." *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 884 (E.D. Mich. 2019); *see also Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 587 (E.D. Mich. 2017) ("Having determined that the named Plaintiffs have standing in their individual capacity, the question of whether the named Plaintiffs have standing to bring claims on behalf of the unnamed class members is analytically subsequent to the class certification analysis."). But, in this Court's opinion, the proper jurisdictional question is not whether the named plaintiffs have standing in some blanket sense. Nor is it whether they have standing to bring some claims. The proper jurisdictional question is whether the named plaintiffs have standing to pursue *each* and *every* claim of their complaint. *See DaimlerChrysler*, 547 U.S. at 352; *Kanuszewski*, 927 F.3d at 406; *Rosen*, 288 F.3d at 928. Or to put it in terms of this case: Do Nestor and Withrow, haling from two states, have standing to pursue each of 110-plus claims under the laws of 50 jurisdictions?

*Three*. There is yet a third a reason that this Court is not persuaded by the cases Nestor and Withrow cite: the Rule 23 inquiry and the standing inquiry are not the same. Part of the rationale courts give for deferring the standing question

to the class-certification stage is that the Rule 23 inquiry—questions about adequacy of representation, typicality of claims, and commonality of issues—subsume the standing inquiry. True, if a claim under the law of the named plaintiff's state is not similar to a claim under the law of another state, then it is quite possible that his claims will not be typical of those he seeks to represent, there will not be common questions that can be resolved in one stroke, and the named plaintiff will not be an adequate representative. But insofar as standing focuses on whether the plaintiff's injury is traceable to the defendant's conduct, it is not too hard to imagine cases where Rule 23 would permit certification—for at least a limited set of issues—but Article III standing would be absent.

Take, for example, this case. Perhaps a nationwide class could be certified for the limited purpose of deciding whether Fiat-Chrysler knew that the CP4 pump was defective and, if so, when it knew. Fiat-Chrysler's knowledge of the defect is likely an element of most (if not all) jurisdictions' fraud-by-omission tort. So perhaps a class could be certified on that issue. In fact, Rule 23(c)(4) expressly provides for certification "with respect to particular issues." *See also* 2 Newberg on Class Actions § 4:90 (5th ed.) ("[Rule 23(c)(4)] may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." (quoting David F. Herr, Manual Complex Lit. § 21.24 (4th ed.)); *see also Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 411–13 (6th Cir. 2018) (discussing Rule 23(c)(4)). But resolving the question of Fiat-Chrysler's knowledge on a class-

wide basis would not mean that Nestor's injury from buying a defective Jeep in California is traceable to Fiat-Chrysler's deceptive trade practices in Montana. So it seems that the Rule 23 analysis does not always subsume a standing analysis.

Indeed, the standing inquiry and Rule 23 inquiry are fundamentally different. Standing is rooted in the Constitution. And the purpose of the doctrine is to protect the tripartite system of government set up by that founding document. *DaimlerChrysler*, 547 U.S. at 353 ("With federal courts . . . deciding issues they would not otherwise be authorized to decide, the tripartite allocation of power that Article III is designed to maintain would quickly erode; our emphasis on the standing requirement's role in maintaining this separation would be rendered hollow rhetoric."). Rule 23, on the other hand, is a procedural device. *See* 1 Newberg on Class Actions § 1:1 (5th ed.) ("Rule 23 is . . . fundamentally a procedural device: it cannot ordinarily be construed to extend or limit the jurisdiction . . . of federal courts."). The purpose of Rule 23 is to efficiently resolve the claims of many, eliminate inconsistent rulings, and grant relief on a collection of small claims that, without aggregation, would not be brought to court. *See* 7A Charles Wright, Arthur Miller, and Mary Kane, Federal Practice and Procedure § 1754 (3d ed.). In short, different origins, different purposes.

So for at least those three reasons, this Court does not find Nestor and Withrow's cases where courts have deferred the standing question to the class-certification stage to be persuasive.

The Court came across another opinion that is a bit more persuasive in support of Nestor and Withrow's standing argument. In *Langan v. Johnson & Johnson Consumer Companies, Inc.*, the plaintiff, a Connecticut resident, sued Johnson & Johnson for deceptive labeling under the Connecticut Unfair Trade Practices Act. 897 F.3d 88, 91 (2d Cir. 2018). The plaintiff also brought claims under "the state consumer protection laws of twenty other states, and sought to certify a plaintiff class." *Id.* According to the Second Circuit, the issue of whether the plaintiff could pursue claims under the laws of states other than her own should be resolved under Rule 23(b)(3) rather than under Article III. *Id.* at 95. That approach, said the appellate court, "acknowledges the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate." *Id.* The court continued, "it makes little sense to dismiss the state law claims of unnamed class members for want of standing when there was no requirement that the named plaintiffs have individual standing to bring those claims in the first place." *Id.*

There is merit in the notion that in a class action, the named plaintiff always pursues relief for another's injury; but without briefing, the Court is not wholly persuaded by the Second Circuit's approach. The Second Circuit pointed to nothing suggesting that the drafters of Rule 23(b)(3)'s predominance standard sought to replace the traditional Article III standard. And the tests are different. Again, the "irreducible constitutional minimum of standing consists of three elements": "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In contrast, Rule 23(b)(3) asks whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Moreover, Rule 23 provides for three types of class actions, only one of which is the predominance variety contemplated by Rule 23(b)(3). So Rule 23(b)(3)'s test would not come into play in all class actions.

All said, in this case, the Court elects to address the standing issue at the motion to dismiss stage rather than in the context of Rule 23. This approach has ample support in the case law. *See In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 656–57 (E.D. Mich. 2011) (citing numerous cases and reasoning, "[t]his Court chooses to follow what it finds to be the better-reasoned opinions on this issue which recognize and refuse to abandon the fundamental prudential standing requirements of Article III."); *see also In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152 (E.D. Pa. 2009) (reasoning that deferring the standing question to class certification "would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union"); *Wozniak v. Ford Motor Co.*, No. 17-12794, 2019 WL 108845,

at *1 (E.D. Mich. Jan. 4, 2019) (addressing Article III standing before class certification stage).

So do Nestor and Withrow have standing to bring claims under the law of states other than their home states or the ones where they bought vehicles (California, Connecticut, and New Jersey)?

What has already been said gives away the answer. But an example drives the point home. Nestor lives in California, was exposed to Fiat-Chrysler's advertising in California, bought his Jeep in California, drove his Jeep in California, and had his CP4 pump repaired in California—the Golden State through and through. Yet, Plaintiffs bring claims on behalf of those who bought or leased a Ram or Jeep in Montana, i.e., Montana consumers. (*See* PageID.866, 1034, 1038.) And according to Plaintiffs, Fiat-Chrysler violated Montana law by using deceptive trade practices to sell to Montana consumers, breaching implied warranties owed to Montana consumers, defrauding Montana consumers, and breaking contracts with Montana consumers—Big Sky Country through and through. (*See* PageID.871–883, 1034–1039.) So, to the extent that Nestor pursues claims under Montana law, there is *no* casual connection between the "challenged conduct" (Fiat-Chrysler's violations of Montana law) and Nestor's injury (the purchase of a defective Jeep in California). Or think of it this way: Fiat-Chrysler's sale of a defective Jeep in violation of Montana law did not make Nestor any worse off. It follows that to the extent Nestor pursues claims under Montana law, he has not "allege[d] personal injury fairly traceable to the defendant's allegedly

*unlawful* conduct." *California v. Texas*, — U.S. —, No. 19-840, 2021 WL 2459255, at *7 (U.S. June 17, 2021) (internal quotation marks omitted; emphasis in original).

So if neither Nestor nor Withrow can pursue a claim that Fiat-Chrysler violated Montana law, which claims can they bring?

As just stated, all of Fiat-Chrysler's alleged conduct leading to Nestor's alleged injuries occurred in California. So Nestor has standing to pursue a claim that Fiat-Chrysler violated California law. That includes Nestor's common-law fraud and breach-of-contract claims. And it includes Fiat-Chrysler's alleged violation of California statutory law: the Consumer Legal Remedies Act, the Unfair Competition Law, and the Song-Beverly Consumer Warranty Act. (PageID.903–912.) Additionally, because the Magnusson-Moss Warranty Act claim is a federal law and is based on the factual assertion that Fiat-Chrysler sold Nestor an unmerchantable Jeep (PageID.872), Nestor also has standing to pursue that claim.

For two counts in the complaint, Withrow's standing is similarly straightforward. Like Nestor, Withrow's injuries all stem from his purchase of a Fiat-Chrysler vehicle with an allegedly defective CP4 pump. And so, like Nestor, Withrow's injuries are fairly traceable to Fiat-Chrysler's alleged fraud and breach of contract. True, unlike Nestor, Withrow lived in one state (Connecticut) but bought his Jeep in another (New Jersey). So there is a question about whether

Connecticut or New Jersey common law governs these two claims. But that is a choice-of-law question, not an Article III question.

The complaint also includes two claims brought "on behalf of" those who bought or leased a 3.0L EcoDiesel Ram or 3.0L EcoDiesel Jeep ("class vehicles") in Connecticut (PageID.919–924) and two claims brought "on behalf of" those who bought or leased class vehicles in New Jersey (PageID.1056–1062). Whether Withrow has Article III standing to pursue these four claims requires a more involved discussion.

Plaintiffs bring a Connecticut Unfair Trade Practices Act count "on behalf of" those who bought or leased a class vehicle in Connecticut. (PageID.919.) Under this count, Plaintiffs allege that Fiat-Chrysler made false representations about the performance of class vehicles and failed to disclose issues with the CP4 pump, both of which are practices prohibited by Connecticut's Act. (*See* PageID.919–922.) Withrow has standing to pursue this claim. He lived in Connecticut, and thus, would have been exposed to Fiat-Chrysler's representations or omissions in that state; and he says those representations and omissions induced him to buy a defective Ram. (PageID.800.) So Withrow's alleged injuries (the purchase of a defective Ram) are fairly traceable to Fiat-Chrysler's alleged violation of the Connecticut Unfair Trade Practices Act (false advertisements directed at, or a failure to disclose the CP4 pump issues to, Connecticuters).

Although more of a stretch, Withrow also has Article III standing to pursue the New Jersey Consumer Fraud Act count brought on behalf of those who bought

or leased a class vehicle in New Jersey. (PageID.1057.) True, Withrow does not claim to have seen Fiat-Chrysler's ads in New Jersey, and Fiat-Chrysler's failure to disclose CP4 pump issues to New Jerseyans could not directly injure Withrow, a Connecticuter. But Withrow did buy his Ram from Autoland in New Jersey. (PageID.799.) And had Fiat-Chrysler disclosed the CP4-pump issues to New Jerseyans, Autoland might have decided to not buy the Ram or, at least, bought it for less. In turn, Autoland would not have sold the Ram to Withrow or, at least, sold it to Withrow for less. As noted, the "fairly traceable" requirement for Article III standing is not a proximate-cause requirement. *See Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 713 (6th Cir. 2015). So Withrow has also standing to pursue the New Jersey Consumer Fraud Act count.

The complaint also includes a breach-of-implied-warranty-of-merchantability count brought on behalf of those who bought or leased a class vehicle in New Jersey. (PageID.1060.) (The complaint does not include a like count for those who bought or leased a class vehicle in Connecticut. (*See* PageID.919–924.)) In this count, Plaintiffs allege that under New Jersey's version of the Uniform Commercial Code, Fiat-Chrysler impliedly warranted that class vehicles were merchantable, but as it turned out, the class vehicles were not fit for their ordinary purpose. (PageID.1061 (citing N.J. Stat. Ann. § 12A:2-314).) Withrow has standing to pursue this claim: Fiat-Chrysler concedes that privity is not required (ECF No. 29, PageID.1581), Withrow bought his Ram in New Jersey, and Withrow claims that his Ram is unmerchantable. So Withrow's alleged injury (the

purchase of an unmerchantable Ram) is fairly traceable to the challenged conduct (Fiat-Chrysler's manufacture and sale of an unmerchantable Ram that was ultimately sold to Withrow in New Jersey). Further, because Withrow's claim under the Magnuson-Moss Warranty Act is merely derivative of his breach-of-implied-warranty claim, Withrow also has standing to pursue a claim under the Magnuson-Moss Warranty Act.

The complaint also includes an unjust-enrichment count brought on behalf of those who bought or leased a class vehicle in Connecticut. (PageID.923.) But the complaint does not include an unjust-enrichment count under every state's law. For instance, there is no unjust-enrichment count brought on behalf of those who bought or leased a class vehicle in New Jersey. (*See* PageID.1056–1062.) So Plaintiffs have only asserted that Fiat-Chrysler was unjustly enriched as prohibited by Connecticut law (and the law of selected other states). That means for Withrow to have standing to pursue any of the complaint's unjust-enrichment claims, his injuries must be fairly traceable to Fiat-Chrysler's violation of Connecticut law (or one of the other states that Plaintiffs have pursued unjust-enrichment claims). But Withrow did not buy his Ram in Connecticut and he has not pled that Fiat-Chrysler originally sold the Ram in Connecticut. So Withrow's alleged injury (paying Fiat-Chrysler for a defective Ram) is not "fairly traceable to the defendant's allegedly *unlawful* conduct" (a violation of Connecticut law), *California v. Texas*, — U.S. —, No. 19-840, 2021 WL 2459255, at *7 (U.S. June 17, 2021) (internal quotation marks omitted; emphasis in original).

In short, Withrow has Article III standing to pursue the following five claims: (1) fraud, (2) breach of contract, (3) violation of the Magnuson-Moss Warranty Act, (4) breach of implied warranty, (4) violation of the Connecticut Unfair Trade Practices Act, and (5) violation of the New Jersey Consumer Fraud Act. Nestor has Article III standing to pursue the following six claims: (1) fraud, (2) breach of contract, (3) violation of the California Consumer Legal Remedies Act, (4) violation of the California Unfair Competition Law, (5) violation of the Song-Berverly Consumer Warranty Act, and (6) violation of the Magnusson-Moss Warranty Act. The Court lacks subject-matter jurisdiction over all other counts of the complaint, and they will be dismissed.

## III.    Rule 12(b)(6)

Having resolved issues relating to this Court's subject-matter jurisdiction, the Court turns to Fiat-Chrysler's efforts to dismiss the remainder of the case pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A.    Standard

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the complaint in the light most favorable" to Nestor and Withrow and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). What is plausible is "a context-specific task" requiring

this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## B.    Choice of Law (Withrow Only)

As noted, Withrow lived in Connecticut both before and after he bought his Dodge Ram, but he bought the truck in New Jersey. (PageID.799.) So Fiat-Chrysler argues that "under the applicable choice of law principles it is New Jersey, not Connecticut, law that must be applied to Withrow's claims." (ECF No. 29, PageID.1561.) Withrow does not really address this issue; in a footnote (of which there are far too many) he merely says that he can bring a claim under Connecticut's Unfair Trade Practices Act because he is a Connecticut resident. (ECF No. 32, PageID.1703.)

The parties have not adequately briefed how Michigan's choice-of-law rules apply to Withrow's claims. *See Nat'l Cont'l Ins. Co. v. Aiazbekov*, 818 F. App'x 468, 471 (6th Cir. 2020) (applying Michigan's choice-of-law rules where jurisdiction was based on diversity of citizenship); *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017) (applying Michigan's choice-of-law rules where jurisdiction was based on federal question). For contract claims, those rules direct courts to identify the state with "the most significant relationship to the transaction and the parties," with relevant considerations including "the place of contracting," "the place of negotiation," "the place of performance," and the parties' domicile. *Aiazbekov*, 818 F. App'x at 471. The parties have not addressed how these factors apply to Withrow's breach-of-contract or breach-of-warranty claims. For tort claims,

29

Michigan's choice-of-law rules default to Michigan law unless another state has a greater interest in having its law apply. *Yarber v. M.J. Elec., LLC*, 824 F. App'x 407, 410 (6th Cir. 2020). While Fiat-Chrysler has a significant presence in the "motor city," it is obvious that Michigan has little interest in a Connecticut resident's purchase of a Dodge Ram in New Jersey, and the parties do almost nothing to explain which of Connecticut or New Jersey has the greater interest. Fiat-Chrysler does cite *McKee v. General Motors LLC*, but that case is not helpful because everything relevant happened in Florida and the parties agreed Florida law applied. *See* 376 F. Supp. 3d 751, 756 (E.D. Mich. 2019).

Although the limited briefing justifies skipping over Fiat-Chrysler's assertion that Withrow can only pursue claims under New Jersey law, addressing the issue will eliminate the need to address other issues raised by Fiat-Chrysler's motion.

Fiat-Chrysler argues that Connecticut's Unfair Trade Practices Act does not extend beyond the state's borders, and since Withrow bought his Dodge Ram in New Jersey, he cannot have a claim under Connecticut's Act.

This strikes the Court as more of failure-to-state-a-claim argument than a choice-of-law argument. But either way, it fails. Connecticut's Unfair Trade Practices Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," and "trade or commerce" includes "advertising" in Connecticut. *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 78 A.3d 167, 187 (Conn. Ct. App. 2013). And Withrow alleges that Fiat-Chrysler's

misleading advertisements induced him to buy his Dodge Ram. (PageID.800.) As discussed in relation to standing, given that Withrow lived in Connecticut before he bought his Ram, it is likely that he was exposed to Fiat-Chrysler's ad campaign in Connecticut—not New Jersey. So the Court is not persuaded by Fiat-Chrysler's argument that Withrow cannot pursue claims under Connecticut's Unfair Trade Practices Act.

Next consider Withrow's common-law fraud claim. The alleged fraud was Fiat-Chrysler's false advertisements or the company's failure to disclose problems with the CP4 pump. But this is primarily, if not exclusively, pre-purchase deception, which, as just stated, occurred in Connecticut. So the Court finds that Connecticut law governs Withrow's fraud claim.

That leaves Withrow's implied-warranty and common-law contract claims. Here, the choice-of-law rules favor New Jersey over Connecticut. In identifying the contract that was allegedly breached, Withrow says that the "sale constituted a contract." (ECF No. 32, PageID.1701.) Since the sale occurred in New Jersey, the alleged contract was formed there. And the primary breach is that the Ram's fuel-injection pump was not compatible with U.S. fuel. But if that is true, then the breach occurred at the point of sale, which was in New Jersey. As for Withrow's implied-warranty claim, an implied warranty of merchantability is also breached at the time of sale. *Herbstman v. Eastman Kodak Co.*, 342 A.2d 181, 184 (N.J. 1975). And, in any event, the complaint contains no implied-warranty claim under

Connecticut law. Accordingly, the Court finds that New Jersey law governs Withrow's breach-of-contract and implied-warranty claims.

The upshot of all this is that Withrow may pursue a claim under Connecticut's consumer protection act and that New Jersey law governs Withrow's fraud, breach-of-contract, and breach-of-implied-warranty claims.

### C. Statute of Limitations (Nestor Only)

Fiat-Chrysler argues that all of Nestor's claims are barred by the applicable statute of limitations. It asserts that the statute of limitations is four years for a breach-of-contract claim, an implied-warranty claim under California's Song-Beverly Act, and a claim under California's Unfair Competition Law. And, according to Fiat-Chrysler, the statute of limitations is three years for both common-law fraud and a claim under California's Consumer Legal Remedies Act. Fiat-Chrysler points out that Nestor bought his Jeep in April 2014, but that he did not sue until more than five years later, in October 2019. Thus, Fiat-Chrysler concludes that all of Nestor's claims are untimely.

In response, Nestor does not dispute that he had only three or four years to bring his claims. Nor does Nestor dispute that he filed suit five years after he bought his Jeep. Instead, Nestor argues that his claims are timely under the discovery rule and the doctrine of fraudulent concealment.

Start with the law on fraudulent concealment. Fiat-Chrysler has cited a case suggesting that to toll the limitations period under California law, a manufacturer must do more than remain silent about facts underlying a legal

claim. *See Garcia v. Gen. Motors LLC*, No. 1:18-01313, 2018 WL 6460196, at *6 (E.D. Cal. Dec. 10, 2018) ("[T]he plaintiff must point to some fraudulent concealment, some active conduct by the defendant above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." (internal quotation marks omitted)). The Court has reviewed the cases Nestor cites regarding fraudulent concealment, and none provides that under California law, mere silence about a legal claim is sufficient to toll the limitations period for that claim. (*See* ECF No. 32, PageID.1706–1708 (citing *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015 WL 4111448 (N.D. Cal. July 7, 2015), *Aberin v. Am. Honda Motor Co.*, Inc., No. 16-CV-04384-JST, 2018 WL 1473085 (N.D. Cal. Mar. 26, 2018), and *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 962 (N.D. Cal. 2014)).) So the Court proceeds under the assumption that to toll the statute of limitations based on fraudulent concealment, Nestor must plead that Fiat-Chrysler took steps to prevent him from discovering that he had a legal claim based on the CP4 pump.

The complaint lacks such allegations. The complaint does allege that Fiat-Chrysler's advertisements included representations about the Jeep that Nestor bought. For instance, ads showed the diesel-powered vehicle on U.S. roadways, perhaps suggesting the Jeep was compatible with U.S. diesel fuel. (ECF No. 26, PageID.802, 852.) And Fiat-Chrysler claimed that the Jeep was "reliable" and "durable" (PageID.802, 852), perhaps suggesting that a critical engine part like the CP4 pump would not fail for a good while. But these were not representations

about the CP4 pump specifically, and it is not plausible that these representations distracted Nestor from discovering issues with the CP4 pump.

The closest Nestor comes to alleging that Fiat-Chrysler actions prevented him from becoming aware of his legal claims is an allegation that Fiat-Chrysler's "company line" is that the pump failed because the consumer used "contaminated fuel." (PageID.797.) If Fiat-Chrysler blamed consumers for pump failures, that might be the type of affirmative conduct that prevented consumers from discovering the defect. But Nestor does not plead that he, personally, was aware of this "company line" and that it discouraged him, personally, from discovering issues with his CP4 pump within the four-year limitations period. True, a dealer allegedly gave Nestor this company line when his fuel pump broke—but that was already five years after Nestor had bought his Jeep.

In short, the Court finds that the complaint does not allege that Fiat-Chrysler's actions prevented Nestor from discovering that he had a cause of action based on the CP4 pump earlier than when he discovered it in April 2019. Based on the complaint, tolling based on fraudulent concealment is not plausible.

That leaves the discovery rule. "The discovery rule postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Philips v. Ford Motor Co.*, No. 14-CV-02989, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015) (internal quotation marks omitted). Fiat Chrysler argues that the discovery rule does not save Nestor's claims because he has neither pled when

he discovered the defect or why he could not have discovered it earlier. (ECF No. 33, PageID.1767.)

The Court disagrees; reading the complaint in the light most favorable to Nestor, he has adequately pled a factual basis for the discovery rule. The alleged defect is not visible: it occurs inside the fuel-injection pump. And nothing in the complaint suggests that prior to his pump breaking, Nestor had learned that CP4 pumps were prone to early failure. It is thus reasonable to infer that Nestor would not have known his pump had issues until it broke. That was in April 2019. This suit followed six months later.

Given that Nestor has adequately pled facts to invoke the discovery rule, the question becomes whether the rule saves all of Nestor's claims? Nestor argues that it does. (ECF No. 32, PageID.1705.) But the cases he cites do not establish that. One of Nestor's cases applied the discovery rule to a fraud claim and claims under California's Unfair Competition Law and Consumer Legal Remedies Act. *Philips v. Ford Motor Co.*, No. 14-CV-02989, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015). But none of Nestor's cases applied the discovery rule to a common-law breach of contract claim, and in a case so heavily litigated, the Court declines to conduct research for Nestor. So the Court finds that under California's discovery rule, Nestor's fraud, Unfair Competition Law, Consumer Legal Remedies Act claims are timely, but his common-law breach-of-contract claim is not.

Remaining then is whether the discovery rule applies to Nestor's implied-warranty claim under the Song-Beverly Act. The case law is mixed: some courts have applied the discovery rule to Song-Beverly Act claims, but others have declined to do so. Nestor relies on *Tanner v. Ford Motor Co.*, 424 F. Supp. 3d 666, 671 (N.D. Cal. 2019), to argue that the rule saves his implied-warranty claim. For its part, Fiat-Chrysler cites two cases finding that the discovery-rule does not delay the statute-of-limitations clock for a Song-Beverly Act claim. (ECF No. 33, PageID.1767 (citing *Mandani v. Volkswagen Group of America, Inc.*, No. 17-CV-07287, 2020 WL 3961975, at *2 (N.D. Cal. July 13, 2020); *Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1017 (S.D. Cal. 2020)).)

The parties have not attempted to reconcile the conflicting case law. From what this Court can tell, part of the division stems from a provision in California's version of the U.C.C. It reads in part, "A breach of warranty occurs when tender of delivery is made, *except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered*." Cal. Com. Code § 2725 (emphasis added). Some courts have found this language inapplicable to implied-warranty claims because an implied warranty never extends to future performance—by definition an implied warranty guarantees that the good, when purchased, is fit for its ordinary purpose. *See e.g.*, *Mandani*, 2020 WL 3961975, at *3. But other courts have pointed out that the Song-Beverly Act extends the implied warranty up to one year post-purchase, i.e.,

36

if an originally merchantable product becomes unmerchantable in its first year of use, there is still breach of the implied warranty of merchantability. *See Audo v. Ford Motor Co.*, No. 3:18-CV-00320, 2018 WL 3323244, at *2 (S.D. Cal. July 6, 2018). Under this view, the Song-Beverly Act apparently transforms all implied warranties into warranties for "future performance," thus triggering the clause, "the cause of action accrues when the breach is or should have been discovered," Cal. Com. Code § 2725.

Absent briefing from the parties on how to resolve the conflicting authority, the Court finds that the discovery rule does not apply to Nestor's implied-warranty claim under the Song-Beverly Act. It appears the future-performance exception to the normal accrual-upon-tender rule is partly justified by having to wait for the future event to happen. For example, if a part is guaranteed to run for 20,000 miles before failure (a promise of future performance), a car will have to be driven 20,001 miles before deciding if there is a cause of action for breach of warranty. *See* 1 White, Summers, & Hillman, Uniform Commercial Code § 12:18 (6th ed.). It thus makes sense that a breach-of-warranty claim could accrue when the part breaks at 19,000 miles, rather than at tender of delivery. Here, under the Song-Beverly Act, the future event was at most one year after Nestor's purchase: to recover under the Act, a product must become unmerchantable, at the latest, one year after tender of delivery. *See* Cal. Civ. Code § 1791.1. But a year after Nestor's purchase was April 2015, which is still more than four years before he filed this lawsuit. In other words, to the extent that the purpose of the discovery

rule is to delay starting the statute-of-limitations clock until a future event occurs, that rationale would only justify starting the limitations clock a year after Nestor bought his vehicle. Accordingly, the Court finds that the discovery rule does not save Nestor's Song-Beverly Act claim from the four-year statute-of-limitations bar. It follows that Nestor's contingent Magnuson-Moss Warranty Act claim is also untimely. (*See* ECF No. 32, PageID.1683 (indicating that MMWA claim is derivative of implied-warranty claim).)

In sum, the Court finds that Nestor's breach-of-contract claim, implied-warranty claim under the Song-Beverly Act, and Magnuson-Moss Warranty Act claim are barred by the applicable statute of limitations and thus will be dismissed. Nestor's fraud, Unfair Competition Law, and Consumer Legal Remedies Act claims are timely under California's discovery rule.

### D.    Fraud Claims

The Court next examines Nestor's and Withrow's fraud claims.

Plaintiffs' fraud claims come in two forms: they assert that Fiat-Chrysler made affirmative misrepresentations and that Fiat-Chrysler failed to disclose a material fact about their vehicles. The Court starts with Fiat-Chrysler's efforts to dismiss Nestor's and Withrow's affirmative-misrepresentation claims and then turns to the fraud-by-omission claims.

### 1.    Affirmative Representations

Nestor and Withrow point to Fiat-Chrysler's advertisements in support of their claim that the car maker made affirmative misrepresentations about their

vehicles. For instance, Nestor and Withrow point out that in its ads, Fiat-Chrysler showed Rams and Jeeps driving on American roadways, which say Plaintiffs, implies that the vehicles are compatible with U.S. diesel. (PageID.852.) As another example, Fiat-Chrysler said Rams and Jeeps with the 3.0L EcoDiesel engine (the engine that uses the CP4 pump) were more fuel efficient than comparable vehicles. (PageID.852–854.) Another ad references "durable engines." (PageID.855.) According to Nestor and Withrow, given the CP4's incompatibility with U.S. diesel and likelihood of early failure, Fiat-Chrysler's advertisements for EcoDiesel Rams and Jeeps were false or misleading.

In response, Fiat-Chrysler argues that Nestor and Withrow "do not plead a single affirmative representation that falls outside the bounds of puffery or opinion." (ECF No. 29, PageID.1570.) Because puffery and opinion generally do not give rise to a viable fraud claim, Fiat-Chrysler asserts that any fraud claims based on affirmative misrepresentations must be dismissed.

The Court agrees. As an initial matter, Plaintiffs recount some statements Fiat-Chrysler made without adequately pleading how they are false or misleading. For instance, Plaintiffs complain that Fiat-Chrysler stated that the "3.0L EcoDiesel V6 utilizes dual-filtration technology for greater . . . durability." Even if the CP4 pump is faulty, dual-filtration technology could still make the engine more durable than one without that technology. As another example, it may be true that the Ram has a "730-mile highway driving range" (PageID.853) even if the CP4 causes the Ram's engine to fail at say, 30,000 miles. And

regardless of truth or falsity, none of the statements Nestor and Withrow recite in their complaint are representations about the CP4 pump specifically. Further, Fiat-Chrysler's statements about reliability and durability are relative statements (reliable and durable relative to what?). They are also subjective statements (is 100,000 miles or 200,000 miles durable?). All of this suggests that Fiat-Chrysler's advertisements are not affirmative misrepresentations about the CP4 pump that can give rise to a claim of fraud.

Case law lends further support for this conclusion. In two other cases involving the CP4 pump (which Nestor and Withrow urge the Court to follow on other issues), courts found that statements similar to the ones pled here were non-actionable puffery or opinion. *Chapman v. Gen. Motors LLC*, No. 19-12333, 2021 WL 1286612, at *14 (E.D. Mich. Mar. 31, 2021) ("The Court does not find any of the advertising descriptors cited by Plaintiffs—'11 percent more fuel efficient,' 'take[s] performance and fuel economy to the next level,' or 'proven durability'— to amount to anything other than puffery."); *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 877 (N.D. Cal. 2019) ("[T]he Court concludes that the representations Plaintiffs cite—including broad claims of 'reliability' and 'durability' as well as marginally more specific references to 'superior fuel economy,' 'torque,' 'horsepower,' and 'emission performance'—amount to mere sales puffery.").

True, two other CP4 cases that Nestor and Withrow have urged this Court to follow found that the manufacturers' ads were actionable misrepresentations.

But in one case, the manufacturer made a representation about the performance of the fuel injectors—a part that works closely with the CP4 pump—and both cases involved Texas law, which allows fraud claims to be based on opinion. *See Stevens v. Ford Motor Co.*, No. 18-456, slip op. at 6 (S.D. Tex. Nov. 2, 2020) ("Plaintiffs set out the advertising materials that Ford published . . . specifically representing that the engine and its fuel system are robust, with 'fuel injectors that achieve a clean, efficient burn.'"); *Click v. Gen. Motors LLC*, No. 2:18-CV-455, 2020 WL 3118577, at *4 (S.D. Tex. Mar. 27, 2020) ("Even an opinion may be actionable.").

In all, the Court finds that Nestor and Withrow have not adequately alleged that Fiat-Chrysler's promotional statements were affirmative misrepresentations giving rise to a common-law fraud claim.

### 2.    Omissions

The Court thus turns to Nestor's and Withrow's fraud claims based on omission.

Fiat-Chrysler seeks to dismiss Plaintiffs' fraud-by-omission claims in several ways. According to Fiat-Chrysler, (1) the complaint lacks the particularity that Federal Rule of Civil Procedure 9(b) demands, (2) the complaint lacks factual allegations establishing its knowledge of the CP4 pump defect, and (3) even if it had knowledge of the defect, it did not have a duty to disclose it under California or Connecticut law.

*Rule 9(b).* The Court disagrees with Fiat-Chrysler that the complaint fails to meet the Rule 9(b)'s demand for specificity. "To maintain its fraud-by-omission claim under [Rule 9(b)'s] standard, [Nestor and Withrow] must specify the who, what, when, where, and how of the alleged *omission.*" *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255–56 (6th Cir. 2012) (internal quotation marks omitted). The "who" is obvious, Fiat-Chrysler. As to "what" was not disclosed, Nestor and Withrow allege that the CP4 pump has a fragile design and that U.S. diesel fuel, depending on the source, is too dry to adequately lubricate the roller and cam in the pump; so, say Plaintiffs, Fiat-Chrysler should have disclosed that the CP4 pump had a fair chance of failing early in the vehicle's lifetime. (PageID.811, 822, 879–880.) Regarding "when" the omission occurred—Plaintiffs say that had they known about the CP4 pump defect before they bought their vehicles, they would not have bought them (or, at least, paid less for them). (PageID.880.) As for "where" the omissions occurred, they occurred in the various channels of information that Fiat-Chrysler used to sell its vehicles. (*See* PageID.879 (referencing "marketing and advertising materials used nationally"); PageID.800.) This Court has previously found like allegations meet Rule 9(b)'s standard, *Gregorio v. Ford Motor Co.*, No. 20-11310, 2021 WL 778913, at *5 (E.D. Mich. Mar. 1, 2021) (Michelson, J.), and it sees no reason to deviate from that decision here.

*Knowledge.* Fiat-Chrysler next claims that Nestor and Withrow have not adequately pled that it knew about the CP4 pump defect before they bought their

vehicles. To address this argument, a summary of the complaint's allegations of Fiat-Chrysler's knowledge is in order.

One way the complaint seeks to establish Fiat-Chrysler's knowledge of the CP4 pump defect is by describing a 2011 investigation by the National Highway Traffic Safety Administration. NHTSA started the investigation based on 160 complaints of engine stalls in Volkswagens and Audis; the stalls appeared to be related to the Bosch CP4 pump. (PageID.830–831.) Among the documents produced to NHTSA during the investigation were communications between the two car makers and Bosch. For instance, in 2008, Audi asked Bosch if the reason pumps in European vehicles did not fail was because the fuel was different in Europe. (*See* PageID.833.) And in 2009, Audi reported to Bosch, "we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is." (PageID.833.) From February to May 2011, Audi, Volkswagen, and Bosch exchanged emails about a substantial increase in warranty claims in U.S. vehicles with the CP4 pump. (PageID.833.) And in September 2011, someone from Volkswagen emailed Bosch, "I think the [CP4.1] failures are well known." (PageID.1341.) These emails and other documents produced in the NHTSA investigation were published on NHTSA's website. (*See* PageID.831.) Thus, Nestor and Withrow allege, "[b]y the end of the 2011, it was well known that Bosch CP4 failures in the U.S. Audi and Volkswagen vehicles were widespread and catastrophic." (PageID.834.)

Although NHTSA only investigated Volkswagen and Audi, Nestor and Withrow allege that, for several reasons, Fiat-Chrysler knew of the investigation and saw the emails. For one, during its investigation, NHTSA not only requested documents from Volkswagen, but also requested documents from Fiat-Chrysler. (PageID.831.) And Nestor and Withrow allege that auto manufactures have departments that "track emerging trends which may impact their business," including "problems with commonly used components on other manufacturer's products." (PageID.834.) And "[s]pecific departments . . . monitor many public (and subscription) sites such as . . . NHTSA.gov . . . to ensure compliance with all standards, regulations." (PageID.835.) Plaintiffs further plead that auto manufacturers "maintain extensive bodies of knowledge such as 'lessons learned' . . . databases," and "'[l]essons learned' from competitors are invaluable since they avoid similar problems during development and production." (PageID.835–836.) Thus, Withrow and Nestor allege, "information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to FCA." (PageID.837.)

Taking all of these allegations together and evaluating them in the light most favorable to Nestor and Withrow, it is reasonable to infer that Fiat-Chrysler knew that the CP4 pump was defective. Contrary to Fiat-Chrysler's assertion that the NHTSA investigation only shows "what the automotive industry knew in general" (ECF No. 29, PageID.1571–1572), Nestor and Withrow have alleged that as part of the 2011 investigation, NHTSA asked Fiat-Chrysler for documents. So

it is reasonable to infer that Fiat-Chrysler knew that NHTSA was investigating complaints about CP4 pump failures. And Nestor and Withrow have alleged that Fiat-Chrysler has monitoring departments, so it reasonable to infer that Fiat-Chrysler would have tracked that investigation. Further, the complaint alleges that the documents produced in the investigation—including emails suggesting that the pump may have difficulties running on U.S. diesel—were made publicly available.

The Court also notes that another judge in this District concluded that allegations similar to Nestor and Withrow's made it plausible that General Motors knew about the CP4 defect. *See Chapman v. Gen. Motors LLC*, No. 19-12333, 2021 WL 1286612, at \*15 (E.D. Mich. Mar. 31, 2021). True, in *Chapman*, when NHTSA asked General Motors to produce documents as part of the 2011 investigation, "GM responded that in the 2nd quarter of 2011 alone, it was aware of at least ninety-nine field reports of high-pressure fuel pump failure" in its vehicles. Amended Complaint, *Chapman v. Gen. Motors LLC*, No. 19-12333 (E.D. Mich. May 22, 2020); *see also Chapman*, 2021 WL 1286612, at \*15 (citing paragraphs 180 and 181 of amended complaint)). Nestor and Withrow do not make a similar allegation about Fiat-Chrysler's production to NHTSA. But the court in *Chapman* did not rely heavily on those allegations. Instead, it explained, "[W]hen GM and other OEMs were asked to submit data [to NHTSA], it seems implausible that GM would not have carefully examined the rest of the investigation materials given its vested interest in knowing as much as possible about the possibility of

problems with the fuel pump that was in its trucks." *Id.* at *15. The court continued, "This investigation involves the same pump model that GM was using, made by the same manufacturer, and includes email communications between Volkswagen, Audi, and Bosch employees specifically discussing the pump, issues with fuel lubricity, and the presence of metal shavings in the pump housing. The Court finds it plausible that this kind of investigation would have put GM on notice about issues with its own CP4 pumps." *Id.* Swap "GM" for "Fiat-Chrysler" in the preceding quotes, and they remain accurate.

In short, it is reasonable to infer that Fiat-Chrysler knew that the CP4 pump was not compatible with the U.S. diesel provided at many gas stations or was otherwise prone to early failure.

*Duty to Disclose.* Fiat-Chrysler seeks dismissal of the fraud-by-omission claims a third way: even if it knew about the CP4 pump defect, neither California nor Connecticut law required it to disclose the defect under the circumstances alleged in the complaint.

As to Nestor's fraud claim under California law, the Court disagrees with Fiat-Chrysler.

Start with the law. Fiat-Chrysler admits that a manufacturer has a duty to disclose a defect if the defect is material and it has exclusive knowledge of the defect. (ECF No. 29, PageID.1574.) Nestor cites a pair of cases indicating that courts interpret "exclusivity" less strictly than the ordinary meaning of the word demands, i.e., merely "superior" knowledge of the defect can give rise to a duty to

disclose. *See Edenborough v. ADT, LLC*, No. 16-CV-02233-JST, 2016 WL 6160174, at *6 (N.D. Cal. Oct. 24, 2016); *Norcia v. Samsung Telecommunications Am., LLC*, No. 14-CV-00582, 2015 WL 4967247, at *7 (N.D. Cal. Aug. 20, 2015). Because Fiat-Chrysler cites no case to the contrary, the Court proceeds under the assumption that superior knowledge suffices.

So has Nestor adequately alleged that Fiat-Chrysler has superior knowledge of the CP4 defect? Yes. As explained, it is reasonable to infer that Fiat-Chrysler knew about the 2011 NHTSA investigation and tracked its progress. And while some consumers were also aware of the history of the CP4 pump, that does not mean that all Jeep owners knew of the issue, let alone Nestor specifically. In fact, the complaint suggests that the first time Nestor became aware of the CP4 pump issue is when his Jeep broke down and a dealer diagnosed metal shavings in the fuel system. (*See* PageID.802–803.) So it is plausible that Fiat-Chrysler's knowledge of the CP4 pump defect was superior to Nestor's.

The Court reaches a different conclusion as to the duty Fiat-Chrysler owed to Withrow. Fiat-Chrysler cites a case implying that under Connecticut's common law, a duty to disclose a known fact arises only if there is a need to clarify a half-truth or the parties have a "special relationship." *See DiMichele v. Perrella*, 120 A.3d 551, 555 (Conn. Ct. App. 2015). Plaintiffs cite around a dozen cases for the proposition that a duty to disclose arises in other circumstances, such as when the manufacturer has superior knowledge of the defect or when the defect poses a safety risk to the consumer. (ECF No. 32, PageID.1693–1700.) But the Court has

examined each of these cases, and the overwhelming majority do not involve Connecticut law at all. And in the one or two cases that included a plaintiff from Connecticut, the court did not do a state-by-state analysis of when a duty to disclose arises and did not examine Connecticut law. So as far as the parties' briefing goes, Fiat-Chrysler's case is more persuasive. It follows that the question is whether Withrow has adequately alleged that Fiat-Chrysler made a partial disclosure that required clarification or whether Withrow and Fiat-Chrysler had a "special relationship." *See DiMichele*, 120 A.3d at 555.

The answer is "no." According to the case cited by Fiat-Chrysler, a vendor-vendee relationship only gives rise to a duty to disclose if the relationship is one of "trust and confidence." *DiMichele*, 120 A.3d at 555. The complaint contains little suggesting that Fiat-Chrysler was some type of fiduciary to Withrow—Withrow simply bought a good that Fiat-Chrysler made (and not even from Fiat-Chrysler, directly). As for partial disclosures, the Court has already found that Fiat-Chrysler's advertising statements were true, puffery, opinion, or some combination and that the complaint does not recite any Fiat-Chrysler advertisement about the CP4 pump specifically. So under the law the parties have provided, Fiat-Chrysler owed no duty to Withrow to disclose the CP4 defect.

In arguing for a different result, Plaintiffs point to an ad where Fiat-Chrysler claimed that the Dodge Ram EcoDiesel offered "fuel-efficient performance" and "biodiesel (B20) capability." (ECF No. 32, PageID.1698; ECF No. 26, PageID.855.) But Plaintiffs have not adequately alleged that the Ram did

not have B20 capability—notably B20 biodiesel fuel has greater lubricity than ordinary diesel, and thus, perhaps, eliminates issues with the CP4 pump. *See* Troy Shoen, *How Biodiesel Can Solve Fleets' Lubricity Problems*, Fleet Equipment (Apr. 17, 2018), https://perma.cc/D8YW-YWQW; U.S. Dep't of Energy Efficiency & Renewable Energy, Diesel Vehicles Using Biodiesel, https://perma.cc/6T9Y-HMCX ("Biodiesel raises the cetane number of the fuel and improves fuel lubricity.") As for Fiat-Chrysler's claim of "fuel-efficient performance," it is true that Plaintiffs have alleged that once the CP4 pump starts to wear, fuel efficiency goes down. But the term "fuel efficient" is both subjective and relative. Even after the pump starts to wear, the Ram may still be "fuel efficient" relative to other vehicles, or it may still be fuel efficient in some people's opinion. Accordingly, Withrow's fraud-by-omission claim will be dismissed.

* * *

In sum, Nestor's and Withrow's fraud claims based on affirmative misrepresentations will be dismissed because Fiat-Chrysler's advertisements were true, puffery, or opinion and because they were not specific to the CP4 pump. Withrow's fraud-by-omission claim will be dismissed because (1) the law provided to the Court indicates that under Connecticut law, Fiat-Chrysler had a duty to disclose only if it made a misleading partial disclosure or if it had special relationship with Withrow and (2) the complaint does not allege facts establishing partial disclosure or a special relationship. Nestor's fraud-by-omission claim will

survive because Fiat-Chrysler plausibly had superior knowledge of the defect, which gives rise to a duty under California law.

### E.    Consumer-Protection-Act Claims

Fiat-Chrysler also asks this Court to dismiss Nestor's and Withrow's consumer-protection-act (CPA) claims.

Two of Plaintiffs' four CPA claims require no new analysis. Other than to argue that Withrow cannot bring a claim under the Connecticut Unfair Trade Practices Act (because he bought his Ram in New Jersey), Fiat-Chrysler treats Withrow's claim under Connecticut's CPA as if it were a common-law fraud claim. (*See* ECF No. 29, PageID.1565 (making same arguments for Counts A.II, F.I-II, H.I-II, FF.I); *see also* ECF No. 29-4, PageID.1605.) As for Nestor, Fiat-Chrysler treats his claim under the California Legal Remedies Act as if it were a common-law fraud claim. (*See* ECF No. 29, PageID.1565; ECF No. 29-4, PageID.1605.) So for the reasons given, Withrow's claim under the Connecticut Unfair Trade Practices Act and Nestor's claim under the California Legal Remedies Act will not be dismissed.

Unlike those two CPA claims, Fiat-Chrysler does make arguments tailored to Withrow's claim under the New Jersey Consumer Fraud Act and Nestor's claim under California's Unfair Competition Law.

As for New Jersey's Consumer Fraud Act, Fiat-Chrysler argues that Withrow must plead that it knew "with certainty" that the CP4 pump would fail prematurely. (ECF No. 29, PageID.1573.) Fiat-Chrysler even cites a case where

the court dismissed a New Jersey CFA claim because the plaintiffs failed to allege that General Motors was certain that the CP4 pump had issues. (ECF No. 29, PageID.1569 (citing *Dawson v. Gen. Motors LLC*, No. 19-8680, 2019 WL 3283046, at *5–6 (D.N.J. July 22, 2019)). Fiat-Chrysler argues that Plaintiffs' factual allegations do not establish that it knew "with certainty" that the CP4 pump was defective and, as such, Withrow has not stated a claim under the CFA. (ECF No. 29, PageID.1573.)

The Court disagrees. Fiat-Chrysler cites *Alban v. BMW of N. Am.*, No. CIV. 09-5398 DRD, 2011 WL 900114, at *10 (D.N.J. Mar. 15, 2011), for the proposition that the NJ CFA requires a manufacturer to know "with certainty" that its product is defective. But the defect in *Alban* did not manifest until after the warranty had expired. *Id.* at *2. Further, *Alban* relied on *Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997, 1005 (N.J. Super. App. Div. 2006), and *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501 (D.N.J. 2009), for the rule that the CFA requires a manufacturer to know "with certainty" that the product is defective. Yet in both *Perkins* and *Maniscalco*, the product also outlasted the warranty. *See Maniscalco*, 627 F. Supp. 2d at 497, 502; *Perkins*, 890 A.2d at 1004. Indeed, the court in *Perkins* was concerned that if courts allowed a CFA claim where the product had outlasted the warranty, courts would effectively renegotiate the parties' bargained-for warranty. 890 A.2d at 1004. Even the very case relied on by Fiat-Chrysler states, "where a good is covered by a warranty *and becomes defective after the warranty period has expired*, an NJCFA violation

occurs only when the defendant has specific knowledge of the defect." *Dawson*, 2019 WL 3283046, at *5 (emphasis added). Here, Withrow's Ram did not outlast the warranty. His Ram failed when it was about two years old and had 31,500 miles on the odometer, yet Fiat-Chrysler warrantied the Ram for 5 years or 100,000 miles. (PageID.799–800.) As such, the Court is not persuaded that the knew-with-certainty test applies to Withrow's CFA claim. And the Court has already found that it is plausible that Fiat-Chrysler knew (perhaps not with certainty) that the CP4 pump was not compatible with U.S. diesel or otherwise would fail prematurely.

The Court is likewise not persuaded by Fiat-Chrysler's efforts to dismiss Nestor's claim under California's Unfair Competition Law. The UCL prohibits "unlawful," "unfair," and "fraudulent" acts and practices—"[e]ach of these three adjectives captures a separate and distinct theory of liability." *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020). Fiat-Chrysler says, "[t]o the extent Plaintiffs intend to invoke the 'unlawful' prong of the UCL, that claim fails because Nestor's claims for violation of the [California Legal Remedies Act], MMWA and Song-Beverly Act all fail." (ECF No. 29, PageID.1579.) But the Court has just found that Nestor's claim under the California Legal Remedies Act is not subject to dismissal because Fiat-Chrysler had not treated the claim differently from Nestor's fraud claim (and Nestor's fraud claim is not subject to dismissal). So Fiat-Chrysler has not shown that Nestor has failed to adequately plead an "unlawful" practice under the UCL. *See Roper v. Big Heart Pet Brands, Inc.*, No.

119CV00406, 2020 WL 7769819, at *13 (E.D. Cal. Dec. 30, 2020) ("[A] CLRA violation suffices as the predicate to a UCL unlawful prong claim." (internal quotation marks omitted)). As for the "fraudulent" prong of the UCL, the Court has found that Nestor has adequately pled a claim of common-law fraud, and Fiat-Chrysler has not explained why the same allegations do not satisfy the fraudulent prong of the UCL. The parties also debate whether Nestor has adequately established the "unfair" prong (ECF No. 29, PageID.157; ECF No. 32, PageID.1702; ECF No. 33, PageID.1777), but because Nestor's UCL claim survives via at least the "unlawful" and "fraudulent" prongs, the Court will entertain that debate at a later date.

In short, Fiat-Chrysler has not persuaded the Court to dismiss Nestor's or Withrow's consumer-protection-act claims.

### F.  Breach-of-Contract Claims

The Court next examines Withrow's common-law, breach-of-contract claim. (As explained above, Nestor's breach-of-contract claim is untimely.)

The Court agrees with Fiat-Chrysler that Withrow has not adequately pled a breach-of-contract claim. The complaint makes a number of general allegations attempting to show that Fiat-Chrysler recognizes "FCA-authorized dealerships" as its sales agents. (PageID.858.) But Withrow bought his Dodge Ram from "Autoland in Springfield, New Jersey," and he does not plead that Autoland was an "FCA-authorized dealership." (PageID.799.) And the omission is telling given that Withrow made a point to allege that he brought his Ram to "an FCA US

dealership" for repair. (PageID.799.) Moreover, Withrow bought his Ram used, meaning that Autoland may not have even bought the Ram from Fiat-Chrysler. Because Withrow did not buy his Ram from Fiat-Chrysler, and because Withrow alleges that the contract at issue was formed by his purchase of the Ram (PageID.882), the Court finds that Withrow has not adequately pled that Fiat-Chrysler formed a contract with Withrow. And without a contract between Fiat-Chrysler and Withrow, Withrow has no basis to claim Fiat-Chrysler breached the contract.

In resisting this result, Withrow cites two cases. Neither persuade. True, in *Bledsoe v. FCA US LLC*, the court allowed a breach-of-contract claim to survive past the pleading stage. *See* 378 F. Supp. 3d 626, 645 (E.D. Mich. 2019). But the court in Bledsoe did not address the issue of contract formation between Fiat-Chrysler and a consumer who buys his Fiat-Chrysler vehicle from a used-car dealer. *See id.* In fact, in a footnote, the court in *Bledsoe* suggested that the breach-of-contract analysis for a used-car purchase might differ from the analysis for a new-car purchase. *Id.* at 645 n.9. Withrow also cites *Joslyn v. Cadillac Automotive Co.*, 177 F. 863 (6th Cir. 1910). But there, the evidence suggested that the sole employee of Cadillac Automotive (it was 1910 after all) was involved in the transaction and that the local company was Cadillac Automotive's agent. *See id.* at 866. Here, the complaint does include facts attempting to show that "FCA-authorized dealerships" are Fiat-Chrysler's agents, but, again, Withrow has not

pled that Autoland was an FCA-authorized dealership. *Joslyn* is thus of no help to Withrow.

In short, the Court cannot reasonably infer from the allegations of the complaint that Fiat-Chrysler was a party to any contract between Withrow and Autoland. As such, Withrow's breach-of-contract claim against Fiat-Chrysler will be dismissed.

## G.  Implied-Warranty Claims

The Court turns to Fiat-Chrysler's efforts to dismiss Plaintiffs' implied-warranty claims. As discussed, Nestor's implied-warranty claim is untimely. So only Withrow's implied-warranty claim still needs to be addressed.

Fiat-Chrysler argues that it did not breach the implied warranty of merchantability because the Ram that Withrow bought was merchantable. Fiat-Chrysler points out that by the time the CP4 pump failed in Withrow's Ram, the truck was two years old and had 31,500 miles on the odometer. (ECF No. 29, PageID.1563; ECF No. 26, PageID.799.) Citing a host of cases, Fiat-Chrysler argues that courts have routinely dismissed implied-warranty claims when "the facts alleged show a plaintiff's vehicle was driven for multiple years and tens of thousands of miles without any problem." (ECF No. 29, PageID.1562); *see also Sheris v. Nissan N. Am. Inc.*, No. 07-2516, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) ("The weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability under the facts where plaintiffs have driven their cars without problems for

years." (internal quotation marks omitted)); *Suddreth v. Mercedes-Benz, LLC*, No. 10-CV-05130, 2011 WL 5240965, at *5 (D.N.J. Oct. 31, 2011) ("It is simply not plausible that a motor vehicle could be classified as not merchantable when it has been used for its intended purpose for 4 years and 50,000 miles.").

The decisional law that Fiat-Chrysler cites does not persuade the Court to dismiss Withrow's implied-warranty claim at the pleading stage. Generally speaking, a good is merchantable if it "is reasonably fit for the general purpose for which it is manufactured and sold." *Henningsen v. Bloomfield Motors*, Inc., 161 A.2d 69, 76 (N.J. 1960). For trucks like Withrow's, its general purpose is to get someone from A to B safely (or, because it is a truck, to get someone *and something* from A to B safely). *See Gregorio v. Ford Motor Co.*, No. 20-11310, 2021 WL 778913, at *17 (E.D. Mich. Mar. 1, 2021). But trucks are also durable goods—they are supposed to last a while. They not only need to get people and things from A to B safely; trucks need to go from A to B safely a fair number of times to be fit for their general purpose. *See Roe v. Ford Motor Co.*, No. 2:18-12528, 2019 WL 3564589, at *12 (E.D. Mich. Aug. 6, 2019) ("Sure, cars are supposed to get people from A to B; but they, like other durable goods, are expected to work for a good while.").

But where to draw the line? A new vehicle that lasts only three months and 5,000 miles before requiring major repair is certainly not merchantable; but one that lasts ten years and 150,000 miles without requiring major repair certainly is. *Cf. Hornberger v. General Motors Corp.*, 929 F. Supp. 884, 888 (E.D. Pa. 1996)

56

("[A] material question of fact does exist as to whether a normal transmission of a newly leased vehicle would fail after being driven approximately 40,000 miles, rendering the car unfit for the purpose of driving and, therefore, unmerchantable."). The "merchantable line" lies somewhere between those extremes.

While the Court draws no bright line, taking the factual allegations of the complaint as true and drawing reasonable inferences in Withrow's favor, it is plausible that his particular Ram was not merchantable because it stopped running several years and tens of thousands of miles before a reasonable consumer would expect it to fail. According to the complaint, diesel vehicles cost more than their gas counterparts because diesel engines are supposed to last a long time—500,000 to 800,000 miles. (PageID.797, 801.) Of course, the lifetime of the vehicle is less than the lifetime of the engine (non-engine parts may fail), but a reasonable inference is that a consumer expects a $40,000, diesel-powered Ram to last many years and well over the 31,500 miles of Withrow's Ram. (PageID.799.) And the repair was not cheap—it was $12,000. (PageID.800.) While discovery on consumer expectations and industry standards might prove that two years and 31,500 miles was long enough to deem the Ram merchantable, it is at least plausible that Withrow's Ram was not merchantable.

But, argues Fiat-Chrysler, after Withrow repaired the damage from the failed CP4 pump, he continued to drive his Ram. Indeed, as of March 2020, the Ram had logged about 17,000 miles since the repair. (PageID.799–800.) Fiat-

Chrysler cites a few cases in support of the proposition that if a consumer continues to drive his vehicle, the vehicle is merchantable. (ECF No. 33, PageID.1768–1769.)

Fiat-Chrysler's cases are distinguishable. In each case, the defect did not prevent the vehicle from being driven. *See Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 743, 762 (E.D. Mich. 2017) (finding vehicle merchantable where named plaintiff drove his vehicle with the alleged defect); *Weidman v. Ford Motor Co.*, No. 18-CV-12719, 2020 WL 674348, at *4 (E.D. Mich. Feb. 11, 2020) ("None of the new Plaintiffs allege that their vehicle cannot brake nor that he or she cannot use his or her vehicle."); *accord Weidman v. Ford Motor Co.*, No. 18-CV-12719, 2019 WL 3003693, at *4 (E.D. Mich. July 10, 2019). Here, Withrow says that he was driving on the highway and his Ram "quit in the middle of the road." (PageID.799.) And from what the Court can glean from the complaint, the truck was, at that point, completely non-operational. Thus, the merchantability analysis in *Beck* and *Wiedman* is not persuasive on the facts of Withrow's case.

In short, Fiat-Chrysler has not shown that it is implausible that Withrow's Ram was unmerchantable; so Withrow's implied-warranty claim is not subject to dismissal. Further, Withrow's claim under the Magnuson-Moss Warranty Act will survive because it is derivative of his implied-warranty claim. (*See* ECF No. 33, PageID.1768 ("There is no dispute Plaintiffs' MMWA claim stands or falls with their state-law warranty claims.").)

**H.    Remedies**

In addition to moving to dismiss Plaintiffs' claims, Fiat-Chrysler also ask this Court to dismiss some of Plaintiffs' requested relief.

For one, Fiat-Chrysler argues that Nestor's and Withrow's allegations in support of punitive damages are conclusory, so that relief should be "stricken or dismissed." (ECF No. 29, PageID.1584.) Fiat-Chrysler also says that to obtain punitive damages under California law, Nestor must allege that the "conduct allegedly giving rise to punitive damages was that of, or was authorized or ratified by, an officer, director, or manager of the corporation." (ECF No. 29, PageID.1584.) This, says Fiat-Chrysler, Nestor has failed to do. (*Id.*)

The Court declines to bar punitive damages at this early stage of the case. First, Nestor and Withrow have plausibly alleged that Fiat-Chrysler knew the CP4 pump had issues with U.S. diesel or was otherwise prone to early failure and, despite this knowledge, decided to sell vehicles with the CP4 pump. And Nestor and Withrow have alleged that the CP4 pump failure can occur while driving, thus presenting a safety risk. A knowing wrong that can lead to physical injury lends some support to a claim of punitive damages. Second, this case will proceed to discovery even if this Court bars punitive damages. And the Court anticipates that discovery on other issues will largely answer whether Fiat-Chrysler acted with the malice required for punitive damages. So there is little to gain in barring punitive damages now. Indeed, the issue would become moot if Fiat-Chrysler prevails in this litigation.

But the Court will dismiss Nestor's claim for enhanced damages under the California Legal Remedies Act because Nestor is not a member of the class of people who may recover those enhanced damages. According to the complaint, "Plaintiffs and California Sub-Class members seek an additional award against FCA of up to $5,000 for each Plaintiff who qualifies as a 'senior citizen' or 'disabled person' under the CLRA." (PageID.906.) But this Court has already explained that Withrow, a Connecticut resident who bought his Ram in New Jersey, has no standing to represent a class of people seeking relief under California law. And while Nestor has standing to pursue his own claim under the California Legal Remedies Act, there are no allegations that Nestor is a "senior citizen" or "disabled person" under the Act. So he has no standing to pursue the Act's enhanced damages (his injury is not fairly traceable to Fiat-Chrysler's conduct toward senior citizens of disabled individuals). And even if Nestor had Article III standing to seek enhanced damages, it is doubtful that he is the proper class representative to pursue that relief. *See* Fed. R. Civ. P. 23(a).

Accordingly, while the Court will not dismiss Nestor's and Withrow's request for punitive damages, it will dismiss Nestor's request for enhanced damages under the California Legal Remedies Act, Cal. Civ. Code § 1780(b).

### I.     Other Arguments for Dismissal

Although anyone reading the entirety of this opinion will likely be exhausted by this point, Fiat-Chrysler makes three additional arguments for dismissal that should be briefly addressed.

*One.* As discussed briefly above, in their complaint, Nestor and Withrow allege that a good fuel-pump design would be able to "withstand some level of customer abuse and neglect, such as inadvertent misfueling, running out of fuel, delaying a filter change, or draining the water separator." (PageID.811.) Fiat-Chrysler seizes this allegation and argues that it simply cannot be true that a product is defective if it cannot withstand "abuse and neglect." (ECF No. 29, PageID.1559; *see also* ECF No. 33, PageID.1765.) On that point, the Court tends to agree with Fiat-Chrysler. But the Court fails to see how that point advances this litigation. Read in the light most favorable to Plaintiffs, the complaint merely alleges that a product should withstand normal wear and tear. A car owner may infrequently put a bit of gasoline in his tank as opposed to diesel. Or once in a while, a car owner may change his fuel filter 30 days late. The Court takes Plaintiffs' point to be that normal use of a vehicle is not perfect use of a vehicle, and the CP4 pump is defective if it cannot withstand common and expected misuse. (*See* ECF No. 32, PageID.1677–1678.) Accordingly, the Court sees no need to dismiss Plaintiffs' claim that the CP4 pump is defective if it cannot withstand "abuse and neglect"—that is simply not Plaintiffs' theory.

*Two.* Per this Court's suggestion, Fiat-Chrysler has undertaken the time-consuming task of creating charts setting out the law in 50 jurisdictions. (*E.g.*, ECF No. 29, PageID.1631–1652.) Relying on these charts, Fiat-Chrysler argues that Plaintiffs' claims under the laws of states other than California, Connecticut, and New Jersey fail. (ECF No. 29, PageID.1581.) In response, Plaintiffs have

created a set of like charts. (ECF No. 32-1, PageID.1717–1756.) Because the Court has found that Nestor and Withrow only have standing to bring claims under the laws of California, Connecticut, and New Jersey, and because the Court has addressed every claim under those states' laws, the Court need not address the parties' extensive charting of the laws of other jurisdictions.

*Three*. Fiat-Chrysler argues that the "sheer breadth and diversity of law applicable to" Nestor and Withrow's "nationwide" claims—breach of contract, fraud, and Magnuson-Moss Warranty Act—"makes clear the requisites of Rule 23 could never be satisfied." (ECF No. 29, PageID.1582.) Perhaps; but that seems like an issue for class certification. And even if, as Fiat-Chrysler argues, it can be addressed on a motion to dismiss, the Court has found that Nestor and Withrow lack standing to bring claims under the laws of states not their own. So the Court need not address this argument either.

## IV.  Conclusion and Order

For the reasons given, the Court GRANTS IN PART and DENIES IN PART Fiat-Chrysler's motion to dismiss (ECF No. 29). The claims that are dismissed and the claims that survive are summarized in the table below (shaded cells indicate claims that are dismissed).

The Court also GRANTS Plaintiffs' motions for leave to file supplemental authority (ECF Nos. 36, 40, 43).

The Court further ORDERS that in the future, any motion to file supplemental briefing is limited to two pages and responses are limited to two

pages; replies are not permitted. Further, the parties should—in a non-argumentative fashion—simply point out how the supplemental authority is relevant to the issues before the Court.

No party is to file any motion until having a video conference with the Court on July 8, 2021 at 2:00 p.m. At the conference, the Court intends to discuss how this case can be managed efficiently, conserving not only counsel's time, but the Court's. Fiat-Chrysler has asserted, "It would be a herculean task for this Court to assess 50 different states' laws, and the interpretations of them." (ECF No. 33, PageID.1779.) Indeed. And that would be on top of the herculean task of resolving this opening motion to dismiss. Thus, the parties are encouraged to come to the conference with creative solutions for making this case manageable by mortals.

Dated: June 21, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

| | Nestor (CA Law) | Withrow (NJ law) | Withrow (CT law) |
|---|---|---|---|
| **Common-Law Fraud** | Survives. | Under choice of law analysis, Connecticut law governs. | Dismissed. Advertisements not actionable fraud and Withrow has not shown that Fiat-Chrysler had a duty to disclose the defect. |
| **Consumer Protection Act** | Survives. (California Legal Remedies Act.) Survives. (California Unfair Competition Law.) | Survives. (New Jersey Consumer Fraud Act.) | Survives. (Connecticut Unfair Trade Practices Act.) |
| **Common-Law Breach of Contract** | Dismissed. Barred by the statute of limitations. | Dismissed. Fiat-Chrysler not a party to the alleged contract. | Under choice of law analysis, New Jersey law governs. |
| **Unjust Enrichment** | Not alleged. | Not alleged. | Dismissed. Withrow lacks Article III standing. |
| **Implied Warranty of Merchantability** | Dismissed. Implied-warranty claim under the Song-Beverly Act barred by the statute of limitations. | Survives. | Not alleged. |
| **Magnuson-Moss Warranty Act** | Dismissed. Rises and falls with implied-warranty claim. | Survives. | |
| **All Other Claims** | Dismissed. Nestor and Withrow lack Article III standing to pursue these claims. | | |