UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFF WITHROW and KEVIN
NESTOR,

      Plaintiffs,                    Case No. 2:19-cv-13214
                                      District Judge Laurie J. Michelson
v.                                Magistrate Judge Kimberly G. Altman

FCA US LLC,

      Defendant.

_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE (ECF No. 65)

I.    Introduction

This is a products liability case involving allegedly defective Bosch CP4 fuel-injection pumps in vehicles made by Defendant FCA US LLC (FCA). Plaintiff Jeff Withrow (Withrow) owned a diesel-powered Dodge Ram 1500 and Plaintiff Kevin Nestor (Nestor) owned a diesel-powered Jeep Grand Cherokee. Both Withrow and Nestor allege that the CP4 pumps in their vehicles failed because of their fragile design and incompatibility with U.S. diesel fuel. *See* Amended Complaint, ECF No. 26.

Before the Court is FCA's motion for sanctions for spoliation of evidence against Nestor directed at the following: (1) Nestor's vehicle, (2) Nestor's file of

1

vehicle records, and (3) Nestor's fuel receipt from April 2019. *See* ECF No. 65.

FCA requests dismissal of Nestor's claims or, in the alternative, a mandatory

adverse evidence instruction to be given at trial. (*Id*., PageID.64-65). It also

"requests that this Court find Nestor to be an atypical and inadequate

representative of the putative class, and, further, that it disqualify Nestor's counsel

of record as class counsel." (*Id*., PageID.65). The motion was referred to the

undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

(ECF No. 69). The motion is fully briefed, (ECF Nos. 65, 66, 68), and was the

subject of a hearing. For the reasons that follow, the undersigned

RECOMMENDS that FCA's motion be DENIED.

## II.    Background

### A.    2014

In or around 2014, Nestor purchased a 2014 Jeep Grand Cherokee with a

diesel engine. (Nestor Deposition, ECF No. 65-3, PageID.2346-2347). Nestor

identified the Jeep as primarily his wife's vehicle from the time of its purchase

until some point in 2020, when it became primarily Nestor's vehicle. (*Id*.,

PageID.2347). However, even though the Jeep "was her car," Nestor "was the

primary driver[.]" (*Id*.).

### B.    2019

On April 19, 2019, Nestor refueled the Jeep with diesel fuel. (*Id*.,

PageID.2369).  He paid with a credit card.  (*Id*., PageID.2369-2370).  At his deposition, Nestor denied putting standard gasoline in the Jeep and stated that he gave the diesel fuel receipt to his wife who then discarded it after reconciling it with the credit card bill.  (*Id*.).

Days later, on or around April 22, 2019, the Jeep "experienced a catastrophic failure of its CP4 fuel pump."  (ECF No. 26, PageID.801).  At that point, the Jeep "shut off without warning and would not restart."  (*Id*.).

The Jeep was then taken to an FCA-authorized dealership in California, and Nestor was eventually informed that "metal shavings from the fuel pump failure had introduced metal shavings throughout the entire fuel system, and that the repair would be nearly $7,000."  (*Id*.).  An invoice for the repair states: "REMOVED FUEL TANK.  FLUSHED FUEL SYSTEM WITH CLEAN DIESEL FUEL. REINSTALLED FUEL TANK."  (ECF No. 79-1, PageID.3255) (capitalization in original).

Although the Jeep was "was still under FCA's 5- year/100,000-mile manufacturer's warranty and only had 68,000 miles on the odometer[,]" FCA denied coverage citing "fuel contamination."  (ECF No. 26, PageID.801-802). Nestor estimated that he spent around $7,600 to repair the Jeep.  (*Id*., PageID.802).

Nestor further testified at deposition that during the time he owned the Jeep, he kept paperwork including the purchase contract, documents received from the

dealership like a brochure, and service records in a file cabinet.  (ECF No. 65-3, PageID.2348, 2351).  Nestor also explained that for "routine things" like oil changes, he took the Jeep to a shop rather than a dealership.  (*Id*., PageID.2362-2363).  Nestor estimated that he took the Jeep to "probably less than six" shops, but he could not recall the names or addresses of any of the shops.  (*Id*., 2362-2368).

On October 31, 2019, Nestor and Withrow filed their original complaint thereby initiating the instant lawsuit, (Original Complaint, ECF No. 1), and at some point, during the prelitigation or litigation process, Nestor's attorney requested specific documents concerning the Jeep, (ECF No. 65-3, PageID.2351-2352).  Nestor gave his attorney the requested documents.  (*Id*., PageID.2352).

## C.    2020

On January 27, 2020, FCA filed a motion to dismiss the original complaint. (ECF No. 17).  In response, Nestor and Withrow filed the amended complaint. (ECF No. 26).  As a result, on April 2, 2020, the District Court denied FCA's motion to dismiss the original complaint as moot.  (ECF No. 28, PageID.1528). On May 26, 2020, FCA filed a motion to dismiss the amended complaint.  (ECF No. 29).

In the fall of 2020, counsel for the parties exchanged several emails regarding the potential sale of the Jeep.  (Emails, ECF No. 65-4).  On September

28, 2020, plaintiff counsel, Bonnie J. Rickert (Ms. Rickert), wrote: "Our client, Kevin Nestor, is looking to sell his vehicle.  Is your client interested in having the vehicle inspected?  If so, we will need to coordinate this inspection in the next 30-45 days.  Please let us know your client's intention as soon as possible." (*Id.*, PageID.2384).  Ms. Rickert sent a follow-up email on October 1, 2020, stating: "Just wanted to follow up on the below email.  Will FCA be requesting to inspect Mr. Nestor's vehicle?  Please let us know either way." (*Id.*, PageID.2383).

On October 2, 2020, defense counsel, Thomas L. Azar, Jr. (Mr. Azar), responded:

> While FCA US anticipates that an inspection of Mr. Nestor's vehicle may eventually become necessary, it is obviously not in a position to conduct any inspection at this point.  Indeed, FCA US does not even know what claims, if any, are going forward, or what specific defect theories or expert opinions/testimony plaintiffs will be relying on.  Nor has FCA US had any opportunity to collect relevant records and testimony about Mr. Nestor's vehicle and claims, which would also be required before any meaningful inspection could occur.  And, it probably goes without saying, but the ongoing pandemic will certainly pose very significant logistical challenges and health/safety issues as well.
>
> FCA US cannot control what plaintiffs might choose to do with their own vehicles.  But, it is FCA US's position that, like all litigants who chose to file a lawsuit, Mr. Nestor and the other plaintiffs in this case have a duty to preserve all relevant evidence and refrain from disposing of/destroying such evidence.  To be absolutely clear, FCA US objects to any plaintiff disposing of a vehicle at issue without prior agreement.

(*Id.*, PageID.2382-2383).  Then, on October 5, 2020, plaintiff counsel, Lauren Akers (Ms. Akers), replied:

Mr. Nestor is not required to indefinitely store the subject vehicle pending the outcome of FCA's motion to dismiss nor the outcome of the Covid-19 pandemic.  All that is required is that he provide FCA with an adequate and meaningful opportunity to inspect the vehicle. *See Stewart v. Michigan Pontiac, LLC*, 2017 WL 633798, at *11 (E.D. Mich. Feb. 16, 2017) (scope of duty to preserve evidence "is not boundless" and may be satisfied where defendant is provided an opportunity for inspection); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 291 (S.D.N.Y. 2011) (citations omitted) ("The duty to preserve evidence 'does not extend indefinitely,' and may be extinguished by provision to the opposing party of an 'adequate and meaningful opportunity to inspect' the evidence.").  We are providing FCA with such an opportunity.  *See, e.g., State Farm Mut. Auto. Ins. Co. v. BMW of N. Am., LLC*, 2009 WL 2447612, at *5 (E.D. Mich. Aug. 7, 2009) (no spoliation of evidence where Plaintiff provided Defendant with opportunity to inspect subject vehicle prior to its destruction); *see also Fanning v. Honeywell Aerospace*, 2016 WL 7017465, at *2–3 (M.D. Tenn. Dec. 1, 2016) (quoting *Pirello v. Gateway Marina*, 2011 WL 4592689, at *5 (E.D.N.Y. Sept. 30, 2011)) ("'[I]t would be unreasonable to expect [an] owner to store [a] boat indefinitely at a cost that far exceeds the value of the boat.'").

We recently had this same situation come up in the *Droesser v. Ford* case, also in the Eastern District of Michigan, without issue, as Ford was able to arrange for its representatives to inspect the selling Plaintiff's vehicle prior to any sale or trade-in (and prior to "collect[ing] relevant records and testimony about [that Plaintiff's] vehicle and claims," which you erroneously assert is "required before any meaningful inspection [can] occur").

Please let us know if FCA wishes to inspect Mr. Nestor's vehicle within the next thirty (30) days.

(*Id.*, PageID.2381-2382).  On October 15, 2020, Mr. Azar sent the final email of

the thread, which states:

6

None of the cases you cite support the notion that Mr. Nestor can force FCA US to conduct a premature and meaningless inspection at this point, or foreclose the possibility of spoliation sanctions, should he choose to dispose of his vehicle now, at the outset of this case.  In fact, the Sixth Circuit has rejected that notion.  *See, e.g.*, *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 Fed.Appx. 453, 457-58 (6th Cir. 2012) (affirming imposition of spoliation sanctions even though defendant was afforded "several opportunities" to inspect allegedly defective product and had participated in inspections by others, given the product's "critical relevance" and plaintiff's clear and ongoing duty to preserve it throughout the case).  Whether such sanctions will be warranted here will obviously depend on how this case (and discovery, once it begins) progresses.

To reiterate, FCA US objects to any plaintiff disposing of any vehicle at issue without prior agreement.

(*Id.*, PageID.2381).

During his deposition, Nestor said that he accidently put standard gasoline in his Jeep's fuel tank sometime after the failure of the CP4 fuel pump at issue.  (ECF No. 65-3, PageID.2357).[1]  Nestor realized his mistake "after pumping a few gallons -- a number of gallons of fuel into the vehicle[.]"  (*Id.*, PageID.2358).  After shutting off the pump, Nestor called a tow truck to tow the Jeep to the dealership.  (*Id.*, PageID.2358).  Nestor denied ever driving the Jeep with standard gasoline in the tank.  (*Id.*).

---

[1] Nestor guessed that he put standard gasoline in the Jeep "sometime in 2021." (ECF No. 65-3, PageID.2357).  However, this guess is probably incorrect because Nestor sold the Jeep on January 1, 2021.  *See id.*, PageID.2347.

7

D.     2021

On January 1, 2021, Nestor traded in his Jeep for a 2021 Jeep Grand Cherokee.  (*Id*., PageID.2347-2349, 2354).  At the time of the trade in, the Jeep had approximately 100,000 miles and "was in good condition" and "running well." (*Id*., PageID.2347, 2371-2372).  Nestor did not tell the purchasing dealership that it should preserve the Jeep as evidence.  (*Id*., PageID.2373).

After trading the Jeep in, Nestor threw away much of the paperwork related to it because that paperwork "didn't seem relevant to the issue at hand." (*Id*., PageID.2348-2349).  The discarded paperwork included a brochure Nestor received at the time of purchase, oil change records, and records related to the purchase of a base plate and tow bar.  (*Id*., PageID.2349-2350).  Nestor did not make a record of exactly what documents he discarded.  (*Id*., PageID.2350).  He explained that he discarded the paperwork to "[m]ake room for more files."  (*Id*., PageID.2351).

On June 21, 2021, the District Court issued an opinion and order granting in part and denying in part FCA's motion to dismiss the amended complaint.  (ECF No. 44).  Subsequently, on September 9, 2021, the District Court entered a scheduling order thereby beginning the formal discovery process.  (ECF No. 53).

III.   Analysis

A.   Legal Standard

Spoliation is "[t]he intentional destruction, mutilation, alteration, or concealment of evidence[.]"  *Spoliation*, BLACK'S LAW DICTIONARY (11th ed. 2019).  "A federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence."  *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (*en banc*) (hereafter, *Adkins I*).

A party seeking spoliation sanctions must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; *and* (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Adkins v. Wolever*, 692 F.3d 499, 503-504 (6th Cir. 2012) (hereafter, *Adkins II*) (cleaned up, emphasis in *Adkins II*).  Once a party has established all three prongs, a district court can "impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence."  *Adkins I*, 554 F.3d at 653.  However, the imposed sanction "must serve both fairness and punitive functions."  *Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x

9

380, 385 (6th Cir. 2013) (internal quotation marks and citations omitted).

In regard to the first and third prongs, a party is required to preserve relevant evidence. *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513-514 (6th Cir. 2014); *see also Arab Am. Civil Rts. League v. Trump*, No. 17-10310, 2017 WL 2501060, at *3 (E.D. Mich. June 9, 2017) ("There is both a common law obligation and a duty under the Federal Rules of Civil Procedure for parties to preserve information in their possession, custody, or control that may be relevant to pending litigation."). In the spoliation context,

> relevant means: something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.

*Automated Solutions Corp.*, 756 F.3d at 514 (internal quotation marks and citations omitted). Additionally, " '[a] party seeking an adverse inference may rely on circumstantial evidence to suggest the contents of destroyed evidence.' " *Id.* (quoting *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 555 (6th Cir. 2010)).

As to the second prong, district courts enjoy relatively broad discretion regarding "the fact-intensive inquiry into a party's degree of fault." *Adkins I*, 554 F.3d at 653. A culpable state of mind can be satisfied if evidence was destroyed or discarded either knowingly or negligently. *Beaven*, 622 F.3d at 554. The veracity of a party's stated reasons for destroying or discarding evidence is an issue of

10

credibility for the district court.  *Id*.

B.    Application

1.    Jeep

Nestor undisputedly traded in his Jeep after commencing litigation against FCA.  However, it is also undisputed that before the trade in, Nestor's attorneys offered defense counsel the opportunity to arrange an inspection of the Jeep.

FCA cites to a number of out-of-circuit cases to support its argument that sanctions are appropriate notwithstanding its opportunity to inspect the Jeep, contending that its opportunity to inspect was not adequate or meaningful.  *See, e.g.*, *Bryant v. Gen. Cas. Co. of Wis.*, 337 F.R.D. 1 (N.D.N.Y. 2020) (dismissing insurance case where the plaintiff had a building destroyed that was insured by the defendant before the defendant had the opportunity to inspect it for the purposes of litigation); *Dickinson Frozen Foods, Inc. v. FPS Food Process Solutions Corp.*, No: 1:17-cv-00519-DCN, 2019 WL 2236080 (D. Idaho May 21, 2019) (holding that an adverse jury instruction imposing a mandatory presumption was proper where the plaintiff had willfully spoliated critical evidence by chopping a large refrigeration unit in half and exposing it to the elements, but had not acted in bad faith); *Keyes v. Hyundai Motor Am.*, No. 2:08-CV-00736-LRH-LRL, 2010 WL 11629638 (D. Nev. Feb. 16, 2010) (dismissing products liability case where car was destroyed by a third party before the defendant had the opportunity to inspect

11

the car); *In re Wechsler*, 121 F. Supp. 2d 404, 438-439 (D. Del. Nov. 14, 2000) (imposing a dispositive sanction after "conclud[ing] that the ATLAS was destroyed in order to prevent the claimants from conducting any further inspection of the vessel").

In addition to these out-of-circuit cases, FCA also cites the Sixth Circuit case *Arch Ins. Co. v. Broan-NuTone, LLC*, 509 F. App'x. 453 (6th Cir. 2012). That case involved a fire that started in a fan/light assembly, and "[b]oth parties' experts participated in the inspection and removal of the fan/light assembly and associated wiring from the scene." *Id*. at 456. After its removal, "[t]he evidence was taken into custody by Donan Engineering, which had been retained by the City of Mt. Sterling to investigate the fire, and was kept at their offices in Louisville, Kentucky." *Id*. Thereafter, representatives of both parties attended a second inspection of the fan/light assembly. *Id*. However, before any additional inspections could occur, Donan Engineering sent an invoice for storage fees to "Collins & Company, a third-party administrator representing the City of Mt. Sterling." *Id*. Without consulting the parties, Collins & Company told Donan Engineering to discard the fan/light assembly. *Id*.

In light of the spoliation of the fan/light assembly, "the district court ordered that the jury be given a permissive adverse inference instruction at trial." *Id*. at 455. At trial,

12

> [the] [d]efendant's expert Richard Kovarsky testified that a certain type
> of scientific test—Scanning Electron Microscope/Energy Dispersive
> Spectroscopy ("SEM/EDS")—would absolutely confirm or refute [the]
> [p]laintiffs' theory of causation.  This test would show whether traces
> of the copper wire could be found on the metal bracket and vice versa,
> thus confirming or refuting [the] [p]laintiffs' theory that the insulation
> around the wires was compromised by the sharp edge of the bracket.
> However, the test was not conducted before the evidence was
> destroyed.

*Id*. at 456-457.  Ultimately, "the jury found that the fan/light assembly

manufactured by [the] [d]efendant departed from its intended design, and that the

manufacturing defect was a substantial factor in causing [the] [p]laintiffs' injury."

*Id*. at 455-456.

On appeal, both sides made arguments about the district court's spoliation

sanction.  The "[d]efendant argue[d] that it was irreparably prejudiced by the loss

of the evidence, and that [the appellate court] should either reverse the judgment

and dismiss [the] [p]laintiffs' complaint or grant a new trial in which the jurors are

instructed that they must presume that the evidence was adverse to [the]

[p]laintiffs."  *Id*. at 457.  The plaintiffs agreed "that *some* spoliation sanction was

proper, but they argue[d] that the district court's adverse inference instruction was

too severe."  *Id*. (emphasis in original).

Ultimately, the Sixth Circuit held that "[t]he district court properly

considered both the fairness and punitive functions of possible spoliation sanctions,

as well as the alternatives requested by [the] [d]efendant, and concluded that an

adverse inference instruction was appropriate." *Id*.  In so holding, the Sixth Circuit found that "[t]he district court considered relevant facts and chose a sanction that was fair to both parties." *Id*.

Although both the district and appellate court acknowledged that the spoliation prejudiced the defendant, the Sixth Circuit noted that the defendant "did not lose the opportunity to present a defense to [the] [p]laintiffs' claim, nor was it totally blindsided by [the] [p]laintiffs' causation theory." *Id*.  For instance, the "[p]laintiffs' insurance adjuster sent two letters to [the] [d]efendant before the evidence was destroyed, each stating specifically that the fire was determined to have been caused by the fan/light assembly manufactured by [the] [d]efendant." *Id*.  The defendant could have chosen to conduct further tests before the destruction of the fan/light assembly.  *Id*.  "Additionally, [the] [d]efendant was able to argue to the jury that [the] [p]laintiffs had negligently allowed the fan/light assembly to be destroyed, and the jury was instructed that they could infer that further testing would have disproved [the] [p]laintiffs' causation theory." *Id*. at 458.  The Sixth Circuit also noted that the adverse inference instruction was a fair punishment for the plaintiffs because they "should have taken steps to ensure that the evidence was preserved." *Id*.

Meanwhile, Nestor cites a few cases from the Sixth Circuit.[2]  Each is discussed below.

The first case Nestor cites is *Stewart v. Mich. Pontiac, LLC*, No. 16-10434, 2017 WL 633798, at *1 (E.D. Mich. Feb. 16, 2017), which involved damage caused by a fire in the plaintiff's leased apartment.  The plaintiff sought spoliation sanctions because the defendants removed a bathroom fan and electrical wiring that she contended caused the fire.  *Id*. at *11.  The district court denied the plaintiff's request for sanctions for three reasons:

> First, [the] [p]laintiff had an opportunity to inspect the evidence allegedly destroyed by [the] [d]efendants.  In fact, [the] [p]laintiff has attached as exhibits to her response photographs of the damaged bathroom ceiling fan/electrical wiring and a video of the unit (including the ceiling fan) after the fire but prior to any removal or restoration of property.  *See e.g.*, *Thiele v. Oddy's Auto and Marine, Inc.*, 906 F. Supp. 158, 162-63 (W.D.N.Y. 1995) (denying [spoliation] sanction requested by a primary defendant who had inspected the evidence before destroying it, while granting [spoliation] sanction in favor of third-party defendant who was not afforded similar opportunity to inspect); *Baliotis v. McNeil*, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994) ("The scope of the duty to preserve evidence is not boundless," but it requires, at minimum, that the defendant be provided an opportunity for

---

[2] In addition to the three cases from this circuit, Nestor also briefly cites to a few out-of-circuit cases.  *See, e.g.*, *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423 (2nd Cir. 2001) (affirming denial of spoliation sanctions where the defendant did not request inspection within one month of being notified of damage to shipping container); *Sterbenz v. Attina*, 205 F. Supp. 2d 65 (E.D.N.Y. 2002) (finding that a three-month period gave the plaintiff an adequate and meaningful opportunity to inspect a vehicle); *Townes v. Cove Haven, Inc.*, No. 00 CV 5603(RCC), 2003 WL 22861921 (S.D.N.Y. Dec. 2, 2003) (finding that the plaintiff had an adequate and meaningful opportunity to inspect a pool when the defendants maintained it in its prelitigation condition for a year following the filing of the complaint).

inspection) (internal quotation marks omitted).

Second, in none of the emails between [the] [p]laintiff's counsel and [the] [d]efendants did counsel express an interest in the bathroom ceiling fan/electrical wiring.   Nor did [the] [p]laintiff or [the] [p]laintiff's counsel ever request that such items be preserved.  Instead, counsel's focus was almost exclusively related to [the] [p]laintiff's access to the apartment, the preservation/restoration of [the] [p]laintiff's personal property and the replacement costs of [the] [p]laintiff's unsalvageable property.

Third, [the] [p]laintiff's counsel effectively disclaimed any interest in the ceiling fan on December 13, 2013.  Specifically, [the] [p]laintiff's counsel's email to [the] [d]efendants confirmed that the "remaining items are available for [Defendants] to inspect, and the unit can now be restored."

*Id*. at *11-12 (punctuation modified).

Next, Nestor cites *Fanning v. Honeywell Aerospace*, No. 3:14-1650, 2016 WL 7017465, at *1 (M.D. Tenn. Dec. 1, 2016), which involved a motion for extraordinary relief filed by nonparty United Parcel Service Co. (UPS).  In its motion, "UPS [sought] to be relieved of its continuing burden of preserving aircraft wreckage which the parties may use as evidence in the trial of this case."  *Id*.  The defendant in the case asked UPS to "preserve the entire cockpit section and attached fuselage (the fuselage forward of the wings), along with nine plastic storage tubs of components and debris."  *Id*.  Preservation of these items required the rental of a hangar space at the rate of $6,000 each month.  *Id*.  Ultimately, "the [c]ourt [found] that the nonparty possessor of other parties' evidence is under no obligation to pay any continuing costs of storage.  The [c]ourt further [found] that

16

UPS has taken all reasonable steps to afford the parties an opportunity to preserve this evidence as they see fit." *Id*. at *4.

Finally, Nestor cites *City of Livonia v. Aquatic Renovation Sys., Inc.*, No. 20-10737, 2022 WL 1651655, at *2 (E.D. Mich. May 24, 2022), which involved the defendant's installation of a pool liner in a public pool owned by the plaintiff. The plaintiff sued after the parties were unable to resolve an unknown issue that was causing the pool liner to bubble. *Id*. at *1-2. Before filing its lawsuit, the plaintiff "removed the liner because, after six months of waiting for [the defendant] to fix the water underneath the liner with no resolution, it wanted to render the pool fully usable to the public." *Id*. at *4. The defendant filed a motion to dismiss as a sanction for spoliation, "contend[ing] that the [plaintiff] engaged in spoliation when it removed the liner from the pool before giving [the defendant] the opportunity to have an expert perform a full evaluation of the pool with the liner in place—and that this removal prejudiced [the defendant]." *Id*. at *4.

The district court, however, declined to sanction the plaintiff. The district court found that the plaintiff did not act in bad faith when it removed the liner and also that the defendant failed to demonstrate that the plaintiff so prejudiced the defendant that it "substantially denied [the defendant] the ability to defend itself." *Id*. at *5. Notably, the district court stated:

17

> But before the [plaintiff] filed this action, [the defendant] had multiple opportunities over approximately six months to inspect the pool and liner together, while the pool was filled and empty. [The defendant] had employees onsite who could have—and did—attempt to determine the cause of the water underneath the liner and fix it.

*Id*.

After considering all the cases, noting that none are truly analogous to the facts of this case, and putting aside the fact that several are out of circuit, the undersigned finds *Arch Ins. Co.* and *Aquatic Renovation Sys., Inc.* to be the most persuasive. Both cases involve defendants who were not able to do the type of inspections that they wanted to do at the times they wanted to do them. Nonetheless, the Sixth Circuit in *Arch Ins. Co.* affirmed the district court's relatively minor sanction of a permissive adverse inference instruction and the district court in *Aquatic Renovation Sys., Inc.* declined to impose any spoliation sanctions at all.

Here, as explained above, on or around April 22, 2019, the Jeep was taken to an FCA-authorized dealership in California that inspected it to determine what caused the fuel pump to fail. (ECF No. 26, PageID.801). Someone employed by the dealership informed Nestor "that metal shavings from the fuel pump failure had introduced metal shavings throughout the entire fuel system[.]" (*Id*.). Then, even though the Jeep was "was still under FCA's 5- year/100,000-mile manufacturer's warranty and only had 68,000 miles on the odometer[,]" FCA denied coverage

18

citing "fuel contamination."  (*Id.*, PageID.801-802).  FCA did not request an inspection at that time.

After the onset of litigation, FCA was offered opportunities to inspect the Jeep.  In September 2020, plaintiff counsel reached out to defense counsel to advise him that Nestor wanted to sell the Jeep.  Defense counsel declined to arrange an inspection because the parties had not yet begun discovery and the parties were waiting for the District Court to rule on FCA's then-pending motion to dismiss.  Rather than request court intervention to stop the sale of the Jeep until such a time as FCA was ready to inspect it, defense counsel chose to wait until July 1, 2022—when he filed the instant motion—to alert the Court to FCA's issues with the sale.  While it was Nestor's duty to preserve the Jeep, FCA's delay in raising the alarm affects the undersigned's decision because it goes to the fairness of a potential sanction.  *See Adkins I*, 554 F.3d at 652 ("[A] proper spoliation sanction should serve both fairness and punitive functions.").

Moreover, because an FCA-authorized dealership inspected the Jeep shortly after the failure of the fuel pump, FCA is not defenseless.  FCA can present its theory that fuel contamination caused the failure by, for example, utilizing the service records from April 2019 and soliciting testimony from the mechanics who repaired the Jeep.

Additionally, *Aquatic Renovation Sys., Inc.* undermines FCA's position that

caselaw "requires that a party retain evidence *at least* until discovery commences, experts are retained, and those experts have sufficient opportunity to do the work necessary for a reasonable inspection." (ECF No. 65, PageID.2325) (emphasis in original). To reiterate, in that case, the district court stated:

> But before the [plaintiff] filed this action, [the defendant] had multiple opportunities over approximately six months to inspect the pool and liner together, while the pool was filled and empty. [The defendant] had employees onsite who could have—and did—attempt to determine the cause of the water underneath the liner and fix it.

*Aquatic Renovation Sys., Inc.*, at \*5. Thus, the undersigned is not persuaded by FCA's position that in every case evidence must be retained until the commencement of discovery.

In sum, the undersigned finds that FCA has failed to meet its burden of establishing that Nestor had a duty to preserve the Jeep at the time of its trade in. Accordingly, sanctions are not appropriate regarding the sale of the Jeep.

### 2. File

Nestor admitted at his deposition that he threw away a file containing records related to the Jeep.

Under the first factor, Nestor had a duty to preserve evidence that *may* have been relevant to this case. *See, e.g.*, *Arab Am. Civil Rts. League*, at \*3 ("There is both a common law obligation and a duty under the Federal Rules of Civil Procedure for parties to preserve information in their possession, custody, or

control that may be relevant to pending litigation."). Records concerning a vehicle that you are suing about may certainly be relevant in such a lawsuit.

As to the second factor, Nestor's action (throwing away the file) was at the very least negligent and could potentially be viewed as intentional. Nestor knew that he was suing FCA because the fuel pump failed in his Jeep. A prudent course would have been for Nester to have checked with his attorney before throwing away paperwork concerning the very subject of his lawsuit.

However, even though FCA has established that throwing away the file of vehicle records satisfies the first two spoliation factors, it fails to do so as to the third. That factor requires the moving party to "adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Automated Solutions Corp.*, 756 F.3d at 514 (internal quotation marks and citations omitted).

FCA says that "it is beyond clear that the evidence Nestor spoliated was relevant to his claims." (ECF No. 65, PageID.2327). It further states:

> If, just by way of example, Nestor's vehicle or the file of discarded records showed there were other instances (beyond the one he now admits) where he contaminated the vehicle's fuel system with standard gasoline, or other abuse, misuse, or neglect of the vehicle, then that would be powerful evidence FCA US could have used not only to challenge Nestor's individual claims but also his suitability as a class representative.

21

(*Id.*, PageID.2327).

The evidence that FCA describes would, in fact, be "powerful."  However, FCA has provided neither circumstantial nor direct evidence showing that the file Nestor discarded included such powerful evidence.

The only evidence concerning the contents of the file comes from Nestor's deposition.  Nestor testified that the discarded file included a brochure he received at the time of the Jeep's purchase, oil change records, and records related to the purchase of a base plate and tow bar.  (ECF No. 65-3, PageID.2349-2350).  Although Nestor did not make a record of exactly what documents he discarded, (*Id.*, PageID.2350), he did testify that the discarded paperwork "didn't seem relevant to the issue at hand," (*Id.*, PageID.2348-2349).

The undersigned finds Nestor's testimony about the contents of the discarded file credible.  *See Beaven*, 622 F.3d at 554 ("[g]iving great deference to the district court's credibility determinations and findings of fact" in affirming spoliation sanctions).  At other points in his deposition, Nestor admitted to damaging facts like an instance where he accidently put standard gasoline in his Jeep.  (*Id.*, PageID.2357-2358).  Nestor's willingness to disclose damaging information suggests that he testified truthfully.  Thus, the undersigned finds that FCA has failed to establish by sufficient evidence that the discarded file contained evidence relevant to a potential defense.  For that reason, no spoliation sanction as

22

to the file is warranted.

### 3.    Fuel Receipt

The final piece of evidence at issue is a fuel receipt from April 19, 2019,

which was the last time that Nestor refueled the Jeep before the fuel pump failed

on or around April 22, 2019.  (ECF No. 65-3, PageID.2369-2370).  At his

deposition, Nestor denied putting standard gasoline in the Jeep on April 19, 2019,

and explained that he gave the diesel fuel receipt to his wife who then presumably

discarded it after reconciling it with the credit card bill.  (*Id.*).

This case began with the filing of the original complaint on October 31,

2019, over six months after Nestor obtained the relevant receipt.  It is certainly true

that "[a]s a general matter, it is beyond question that a party to civil litigation has a

duty to preserve relevant information . . . when that party has notice that the

evidence is relevant to litigation or . . . should have known that the evidence may

be relevant to future litigation."  *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir.

2008) (internal quotation marks and citations omitted).  However, Nestor obtained

the receipt *before* litigation began; it is far from clear that he "should have known

that the evidence may be relevant to future litigation."  *Id.*  The fuel pump failed

*after* Nestor obtained the receipt, and he indicated at his deposition that he did not

begin to contemplate litigation until after learning how much repairing the Jeep

would cost.  *See id.*, PageID.2374.  It is unclear from the provided deposition

23

excerpts both the precise date on which Nestor gave his wife the receipt and the precise date on which Nestor's wife discarded the receipt in her normal course of business.

Accordingly, based on the evidence before the undersigned, FCA has failed to establish that Nestor had a duty to preserve the fuel receipt from April 19, 2019. Thus, the undersigned does not recommend imposing spoliation sanctions on Nestor for failing to preserve it.[3]

### 4.    Counsel's Role

FCA argues that Nestor's counsel is responsible for the spoliation it alleges occurred in this case and that his counsel should thus be prohibited from acting as class counsel.  *See, e.g.*, *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class.").  However, as discussed above, FCA has failed to establish that any spoliation occurred.  Accordingly, there is no basis for the removal or disqualification of Nestor's counsel from acting as class counsel.

---

[3] The undersigned also questions whether the receipt would have specified what type of fuel Nestor purchased.  FCA has not provided any evidence on this point. For instance, FCA has not provided an example of a receipt from the gas station where Nestor refueled on April 19, 2019.

24

5.      Sanctions Against FCA

Nestor argues that FCA should be sanctioned because its motion "unfairly and unjustly" accuses him of "egregious" discovery violations "based on no facts whatsoever."  (ECF No. 66, PageID.2413).  In particular, Nestor "request[s] sanctions, attorneys' costs, and fees for responding to this motion, and to deter FCA from frivolous and slanderous motions in the future."  (*Id.*).

Sanctions are only warranted under 28 U.S.C. § 1927 when an attorney "so multiplies the proceedings in any case unreasonably and vexatiously."  Or, in other words, "when an attorney objectively falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party."  *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006) (internal quotation marks and citation omitted).  "The purpose is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy."  *Id.*

The undersigned does not believe that sanctions against FCA are appropriate or warranted.  Although the undersigned has not found FCA's motion persuasive, it was not frivolous.

IV.    Conclusion

For the reasons stated above, the undersigned RECOMMENDS that FCA's motion for sanctions for spoliation of evidence, (ECF No. 65), be DENIED.  It is

further RECOMMENDED that Nestor's request for sanctions under 28 U.S.C.

§ 1927 be DENIED.


Dated: November 17, 2022                    s/Kimberly G. Altman
Detroit, Michigan                           KIMBERLY G. ALTMAN
                                            United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

26

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the court determines that any objections are without

merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 21, 2022.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager